Norman L. HARWELL, et al., Plaintiffs-Appellants,

v.

GROWTH PROGRAMS, INC., et al., Defendants-Appellees.

No. 30501.

United States Court of Appeals, Fifth Circuit.

Oct. 15, 1971.

Rehearing and Rehearing En Banc Denied April 11, 1972.

---

3. In Virginia the jury fixes the punishment.

**242**

Teairl W. Lewis, Clarence R. Boatwright, San Antonio, Tex., Fiorenzo V. Lopardo, Robert A. Hefner, Escondido, Cal., Benjamin H. Dorsey, Washington, D. C., for plaintiffs-appellants.

James D. Baskin, Jr., Lionel R. Fuller, Joel H. Pullen, San Antonio, Tex., Frank J. Wilson, Washington, D. C., for defendants-appellees.

Paul Gonson, Asst. Gen. Counsel, Kathryn B. McGrath, Warren G. Stolusky, Attys., Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Sol. S. E. C., Washington, D. C., amicus curiae, for defendants-appellees.

Before COLEMAN, SIMPSON and RONEY, Circuit Judges.

RONEY, Circuit Judge:

This is an appeal from a summary judgment against holders of single investment mutual fund programs who sought relief from the failure of the sponsor of such programs to comply with that portion of their investment contracts which permitted the holders to move in and out of an investment position in the fund, without the payment of brokerage commissions, on an unlimited basis. The sponsor refused to comply with this unlimited privilege in the investment contract because the National Association of Securities Dealers (NASD) issued an Interpretation of its rules which made it improper for its members to be involved with the unlimited manner in which the "in-and-out" privilege was being used.

The district court by summary judgment held that the Association had authority to promulgate an "interpretation" of its rules limiting the "in-and-out" privilege even in existing contracts providing unlimited privilege, that the purchasers were not denied due process, that they were not entitled to damages for breach of contract, and that the NASD was immune from antitrust liability. Harwell v. Growth Programs, Inc., 315 F.Supp. 1184 (W.D.Tex.1970).

We reverse and remand on the ground that this case was not disposed of properly by summary judgment. There are difficult issues which can be determined only after a trial on the merits.

The parties tell us that this case presents questions of first impression which will establish important precedents in the field of securities law. It is not our intention by this decision to make any final determination of those questions. It seems inappropriate to try to determine the precise rules which should be applied until the case has been heard on the merits, the facts have been fully developed and the trial judge has made the difficult reconciliations required on the evidence presented.

To that end we review the matter briefly so that the trial court will know the problems we foresee that it will have to confront and solve before rendering a final decision in this case.

### The Parties.

Originally a defendant but dropped by stipulation, Technology Fund, Inc., is an open-end investment company commonly referred to as a mutual fund, which invests the money it receives from the sale of its common shares in securities of other companies. As an open-end investment company, it continuously offers its shares for sale to the public and

stands ready at any time to repurchase any of its outstanding shares when presented to it by a shareholder.

Defendant Supervised Investors Services, Inc. separately owned and operated from the Fund, is the management company for the Fund, is the principal underwriter for the sale of the Fund's shares, is a registered broker-dealer under Section 15 of the Securities Exchange Act of 1934, and is a member of the NASD.

The principal method of offering the Fund's shares is through wholesale sales by Supervised to broker-dealers, who in turn sell them retail to the public. In addition, the shares of the Fund are offered through what are known as "contractual plans."

Defendant Growth Programs, Inc. sells the contractual plans. This involves the sale of a plan certificate which evidences a beneficial interest in the shares of the mutual fund. The holder may redeem his certificate for the cash value of the underlying shares, or, at his option, may receive the shares themselves. Growth is a subsidiary corporation of Supervised and a registered broker-dealer under the Securities Exchange Act and a member of the NASD.

The plaintiffs represent as a class persons who have purchased contractual plans from Growth.

### The Investment Contract.

The plans held by plaintiffs are what are known as single investment plans, for which the holders paid a single lump sum of money. The plan is registered with the Securities Exchange Commission under the Securities Act of 1933.

The withdrawal and reinstatement privilege set forth in the programs, the so-called "in-and-out" privilege, provides that a programholder can withdraw and convert into cash, from time to time, up to 90% of the Fund shares underlying his plan and thereafter reinvest the same amount of cash in shares of the Fund without the payment of a further sales charge. Instructions for withdrawal and reinstatement can be made by telephone or wire through a broker-dealer representing the programholder, and the price at which such withdrawals and reinstatements are to be effected is the net asset value of the underlying Fund shares at the time the telephone or wire instructions are received.

### The NASD "Interpretation".

In July, 1966, after all of the plaintiffs had purchased their contracts, the National Association of Securities Dealers published an "Interpretation With Respect to Contractual Plan Withdrawal and Reinstatement Privileges" by which it sought to interpret the following Section 1 of Article III of the Rules of Fair Practice, which were adopted in 1939 by the NASD:

"A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade."

By its Interpretation, the NASD in effect made it a violation of this Rule of Fair Practice for any of its members to suggest, encourage or assist any planholder in the unlimited exercise of the "in-and-out" privilege, placing severe limits on the reasons for, and the frequency of, withdrawal and reinstatement.[1] The penalty suffered by a

---

1. Although withdrawal and reinvestment clauses have been included in investment plan contracts since 1930 for the declared purpose of protecting investors against temporary financial emergencies, it was not until 1965 that Growth devised a contract designed to facilitate the use of the privilege by establishing a procedure for telephone and wire orders, use of power of attorney to execute the privilege, and establishment of credit at a bank

which eliminated the need for transfer of funds. These procedures were not all written into the contract, but they, together with the pricing method then being used which generally guaranteed success on the exercise of the privilege (see fn. 2), permitted the use of the privilege for speculating on short swings of the market. This resulted in massive withdrawals and reinvestments, often on the same day, and an alleged dilution in the interests of

broker-dealer member who violates the Rules of the NASD could be such as to put him out of the securities dealers business. After the Interpretation was issued, the plaintiffs were effectively foreclosed from exercising the privilege as provided in the contract because no broker-dealer could execute their orders in the same manner as before.

### The Arguments.

The plaintiffs claim that there is an admitted breach of contract for which they are entitled to an injunction, specific performance and damages. In addition they assert that the NASD had no authority to promulgate the Interpretation and therefore is liable for damages for tortious interference with plaintiffs' contracts and that the defendants are liable for damages for violation of the antitrust laws.

Growth and Supervised argue that the NASD Interpretation resulted from a valid exercise of the authority granted the NASD by the Maloney Act, that they cannot be held liable for breaching the plaintiffs' contracts where the breach resulted from their required compliance with the Interpretation, that the NASD and its members are immune from antitrust action because the NASD is acting in a quasi-governmental capacity under the Maloney Act under close supervision of the SEC, that the class plaintiffs who are also members of NASD are estopped from asserting a cause of action against Growth and Supervised, and further argue that Growth is not merely the alter ego of Supervised and that the district court erred only in its holding that Supervised could be held liable in the event Growth should be liable.

The NASD argues that any interference with plaintiffs' contracts was not wrongful because it was properly exercising its delegated authority pursuant to the Maloney Act, that its Interpretation was valid and that it was not retroactive because it merely interpreted a

Rule which had been in effect for approximately 26 years, that plaintiffs showed no violation of the antitrust laws and that in any event the antitrust laws do not apply to this situation, and that there was no constitutional infirmity in the Association's actions. It disclaims any position as to liability of Growth Programs or Supervised Investors to the plaintiffs for breach of contract.

The Securities and Exchange Commission has filed an amicus curiae brief in which it defends the NASD Interpretation as being clearly within its power under the Maloney Act and not promulgated in violation of due process of law, and argues that the issuance of the Interpretation of existing Rules of Fair Practice by NASD, with SEC concurrence, did not constitute a violation of the antitrust laws. It, too, took no position as to the liability of Growth Programs or Supervised Investors to plaintiffs on the breach of contract action.

### The Issues.

We agree with the district court that "the path to a correct decision is lined with deep-rooted public policy considerations" and that this "is not simply a garden variety breach of contract action." Plaintiffs' apparent refusal to recognize this fact undoubtedly beclouds the issues and may very well ultimately be fatal to their case. They must in the end carry the burden of showing the exact relief to which they are entitled, if any, taking into full consideration the public interest that the Commission and the NASD have been charged by Congress to protect. Governmental regulation of the securities market is too much a part of today's life to provide much validity to the broad attacks which the plaintiffs make on the authority of the SEC and the NASD. Anyone dealing in securities today must be charged with the knowledge that they are operating in a closely regulated field in which the public interest and public policy play a dominant part.

---

the other 110,000 shareholders. There were 1298 shareholders in plaintiffs' class. It was this activity which motivated the action of the NASD.

■ Notwithstanding this, however, the lower court must determine from the evidence and the facts whether or not the retroactive effect of the NASD Interpretation was necessary to protect that public interest. A reasonable rule for prospective conduct could well be unreasonable when applied retrospectively. We are not persuaded by the NASD argument that this is not a new rule, but merely an interpretation of an old rule, and therefore one that has been in effect for 26 years. There appears little doubt that this Interpretation was aimed directly at Growth and these plaintiffs, and another fund that had developed a similar type of contract. The case has to be dealt with on these terms.

In addition to the extent to which the public interest required retroactive application of the Interpretation, there are distinct issues of fact which are relevant and must be given full consideration: whether SEC or NASD approved the unlimited "in-and-out" privilege; whether plaintiffs' activities constituted an "abuse" of their privilege or did in fact violate the provisions of their contracts; whether due process was afforded to these parties administratively; whether Growth itself was involved in the development of the Interpretation; and whether Growth made representations on the sale of these investment contracts and encouraged the use of the privilege.

It is noted that NASD has argued that the case is largely, if not completely, moot because a key ingredient in the successful exercise of the privilege was the method of computation of price. This has now been changed by action of the NASD, the SEC, and the custodian bank of Technology Fund, Inc., the underlying mutual fund of Growth. The facts concerning this argument must be considered in determining whether it was the privilege itself which was contrary to public interest, or the pricing method by which it could be used. Plaintiffs had no contractual right to the pricing method.[2]

■ It is generally conceded that Growth breached its contracts with the plaintiffs. After an examination of all of the facts, the court can determine whether Growth might be liable for damages, even if the court should determine that the contracts cannot be specifically enforced. The parties to a contract rendered impossible to perform by government regulation are not always excluded from the exposure to liability. The NASD Interpretation does not make the contract illegal but only makes it improper for the NASD members to be involved with it. There is a distinction between a literal impossibility of performance and mere economic inadvisability. See Haby v. Stanolind Oil and Gas Co., 228 F.2d 298 (5th Cir. 1955). The representations Growth made on the sale of the contracts to plaintiffs, the extent to which Growth was involved in the administrative process, the extent to which it could have preserved the possibility of performance, the extent to which it encouraged the plaintiffs' so-called "abuse" of the "in-and-out" privilege are all facts which must first be determined before a decision can be made as to whether any remedy is available to plaintiffs for the admitted breach of their contracts.

We should comment on the antitrust aspect of the decision of the court below.

---

2. Under the prior price system, the net asset value of the mutual fund shares was computed twice per day, as of 1:00 P.M. to become effective at 2:00 P.M. and as of 3:30 P.M. to become effective at 4:30 P.M. Thus a broker had an hour within which to compute or otherwise ascertain the next price. Plaintiffs could withdraw and reinvest with absolute certainty that a lower next price would give them an in-increased number of shares. The NASD brief states that as a result of this:

"They could not suffer a loss because they knew the next price and compared it with the previous price, which previous price would be applicable to the withdrawal. The next price would apply to reinvestment. The net effect of this was that the plaintiffs could do what every investor wishes he could do, that is, know the future value of his investment before he buys."

To do this we will assume, without deciding, that the actions of the defendants alleged in the complaint would constitute a violation of the antitrust laws had they occurred in the ordinary course of commerce.[3] The question is whether the defendants can escape the application of those laws to their activity. The defendants argue that their conduct was authorized by the Maloney Act and cloaked with specific Congressional immunity by virtue of 15 U.S.C. § 78o–3(n) which provides:

"(n) If any provision of this section is in conflict with any provision of any law of the United States in force on June 25, 1938, the provision of this section shall prevail."

There has been no authoritative decision on the extent to which this section gives the NASD and its members antitrust immunity. It has been indicated on numerous occasions that this section was intended by Congress to lift the ban of antitrust laws against conduct of the NASD pursuant to § 78o–3.[4]

█ This section, by its terms, grants no specific antitrust immunity. However, it seems clear that if conduct is permitted, authorized or required by this Act, Congress intended that such action would not be prohibited by any law in force on June 25, 1938, including the antitrust law. But it does not follow that NASD and its members are immune from antitrust attack in *all* of their activities, and neither the NASD nor the SEC so argue. The question is whether there is immunity in the making of this Interpretation.

█ The NASD is authorized, even required, by the Act to promulgate rules designed to promote just and equitable principles of trade and to protect investors and the public interest.[5] The court must determine when the NASD is immune from antitrust penalty in acting in its rule making capacity. It appears to

---

3. We agree with the district court that these allegations are vague, and may lack merit, but the court did not consider the claim on the merits.

4. United States v. Socony-Vacuum Oil Co., 310 U.S. 150 (1940) [fn. 60 in Justice Douglas' opinion, p. 227], 60 S.Ct. 811, 84 L.Ed. 1129; International Ass'n of Machinists v. Street, 367 U.S. 740 (1961) [fn. 16 in Justice Frankfurter's dissenting opinion, p. 809], 81 S.Ct. 1784, 6 L. Ed.2d 1141; United States v. Morgan, 118 F.Supp. 621 (S.D.N.Y.1953) ["By express statutory provision, Securities Exchange Act of 1934, Section 15A(n), the Rules of Fair Practice of the NASD are, when approved by the SEC, exempt from the application of the antitrust laws, if in conflict. This is not disputed." Judge Medina's opinion, p. 693]; Silver v. New York Stock Exchange, 302 F.2d 714 (2 Cir., 1962), rev'd 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1962) ["In other provisions of the Securities Exchange Act, namely those sections governing over-the-counter brokers' and dealers' associations, 52 Stat. 1070 (1938), 15 U.S.C.A. § 78o–3, the draftsmen of our securities statutes provided an explicit exemption from the anti-trust laws. 15 U.S.C.A. § 78o–3(n)." Judge Waterman's dissenting opinion, p. 722]; Silver v. New York Stock Exchange, 196 F.Supp. 209 (S.D.

N.Y.1961), ["Moreover, in the 1938 amendment Congress expressly provided that in the event of conflict between any provisions of the 1938 Act and any other provisions of law, the provisions of the 1938 Act should prevail. 15 U.S.C.A. § 78o–3(n). This, of course, includes the anti-trust laws." Judge Bryan's opinion, p. 220]; See Loss on Security Regulations, Vol. II, Chapter 8C3 "The Maloney Act and the Anti-Trust Laws," p. 1369.

5. 15 U.S.C. § 78o–3(b) An applicant association shall not be registered as a national securities association unless it appears to the Commission that—
(8) the rules of the association are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to provide safeguards against unreasonable profits or unreasonable rates of commissions or other charges, and, in general, to protect investors and the public interest, and to remove impediments to and perfect the mechanism of a free and open market; and are not designed to permit unfair discrimination between customers or issuers, or brokers or dealers, to fix minimum profits; to impose any schedule of prices, or to impose any schedule or fix minimum rates of commissions, allowances, discounts, or other charges.

us that by judicial interpretation Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1962) has added to the Act regulating Securities Exchanges, the same Congressional intent explicitly set forth in the Act regulating brokers' and dealers' associations. Implicit in the judgment of the whole court in *Silver*, majority, concurring and dissenting, is the basic concept that the Securities Act prevails over the antitrust acts, when the provisions of the two are in conflict. It seems to us that § 78*o*–3(n) provides no more. *Silver* then furnishes the guide which must be followed, i.e., that the repeal of the antitrust barrier to defendants' actions occurs only if those actions are necessary to make the statutory scheme for regulation of securities dealers work, and then only to the minimum extent necessary. In other words, the Maloney Act "prevails" over any other laws of the United States only to the extent that they conflict. To determine if they conflict, the Maloney Act should be construed to reach only those things necessary to carry out the purposes of the Act.

■ This should be the thrust of the further proceedings in this case, insofar as it relates to the antitrust claim. It is argued with some force that this case is different than *Silver* because here the NASD acted under close supervision of the SEC. The extent of that supervision is not readily apparent from the record. In any event this argument, as applied to the New York Stock Exchange, was rejected in Thill Securities Corporation v. New York Stock Exchange, 433 F.2d 264 (7th Cir. 1970) and it would seem that it should be rejected here for the reasons set forth in that multiple opinion case.

. The Maloney Act explicity provides that the Commission is to consider antitrust effect in connection with the rules of the national securities association. 15 U.S.C. § 78*o*–3(b) (8). The record is barren of what consideration, if any, was given.

The decisions concerning the exhaustion of administrative remedies, the effect of the litigation in which shareholders sued the Fund for damages because of the misuse of the "in-and-out" privilege, Lessac v. Television-Electronics Fund and Stuart v. Tripp, CCH Fed. Sec.L.Rep. § 92,305 (S.D.N.Y.1968) and the question as to whether Growth was the alter ego of Supervised are all open for reconsideration by the court upon remand.

Reversal.

On all of these matters we simply hold that the lower court decided too much on broad principles that may or may not be applicable when the final determination is made of all of the detailed issues which must be reconciled in a case of this kind.

Reversed and remanded.