ACME MOVING AND STORAGE CORPORATION
*v.* BOWER

[No. 321, September Term, 1972.]

*Decided July 9, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH and LEVINE, JJ.

*A. Slater Clarke* for appellant.

*John Lewis Kelly,* with whom were *Kelly & Racoosin* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The Circuit Court for Prince George's County, in Equity (Couch, J.), on November 3, 1972, dismissed the bill of complaint of the appellant, Acme Moving and Storage

Corporation (Acme), which sought specific performance of a lease between the appellee, Donald W. Bower, as landlord, and Acme, as tenant. The lease was for a warehouse with an option to lease another warehouse under construction and surrounding land located southeast of the intersection of Oxon Hill Road and Livingston Road in Prince George's County.

The relevant facts are, for the most part, not in dispute. The lease dated June 30, 1970, was prepared by Andrew J. Moore, a real estate broker, but not a member of the bar, acting as agent for the landlord, Bower. It is not a model of clarity or consistency. It provides, *inter alia*, that the "term of this lease shall be ten (10) years commencing upon the date all streets and parking areas as herebefore specified have been completed and the sprinkler system has been installed and a 'Use and Occupancy' permit can be obtained, whereby government storage can be made in and on the property, meaning that the federal government must approve storage for military transferees in and on the property."

The lease further provided:

"The rent shall be $38,610.00 per year, payable in advance with monthly installments of $3,217.50 per month. The Tenant shall pay for all increases of taxes that may be levied after the tax year of 1970-71."

Then follows the option to lease another warehouse building:

"As further consideration in this lease the Tenant shall have the option to lease another building (162 x 87), now constructed, facing the leased property containing approximately 14,094 square feet upon the same terms and conditions stated herein at $1.35 per square foot, however, no office space is to be installed in this building. In the event the Landlord places the property on the market for sale, the Tenant shall have the first right of refusal

to purchase any and all properties leased at that time."

At the bottom of the first page of the lease is the following hand-printed sentence with the initials "D.W.B":

"The optioned building rent shall start upon use and occupancy permit & government approval."

Then follow 18 separate covenants which Acme, as tenant, agrees to perform. They include covenants to pay the rent at the time specified without deduction or demand, to use the premises for moving and storage and no other purpose, to comply with all orders, requirements imposed by the ordinances, laws and regulations of the municipality in which the premises are located so far as they are required in the conduct of the tenant's business and that the tenant would not assign or transfer the lease without obtaining the written consent of the landlord. This latter covenant is to be contrasted with another provision in the lease purporting to give the tenant "the option to sub-lease to others from time to time during the time of this Agreement including floor space, parking area, ingress and egress . . ." without any provision for obtaining the written consent of the landlord.

The lease further provides:

"IT IS FURTHER AGREED AND UNDER-STOOD, that this lease shall start upon installation of the sprinkler system being approved by Prince George's County, the State of Maryland, and the Department of Defense. The Lessor agrees to install the system and have the inspection as soon as possible and the Tenant agrees to make applications to have the building approved in accordance with the foregoing acceptance. However, the Tenant, from time to time, may have storage contracts not applying to the federal government for which the property could be used. Said Tenant agrees to pay on an annual rental basis of $1.35 per square foot for all the square footage used for non-federal government use. The square

footage use of non-military use shall be computed from time to time to determine the amount of floor space used to determine rents due at $1.35 per square foot. It is agreed and understood that the Tenant herein shall have the option to sub-lease to others from time to time during the time of this Agreement including floor space, parking area, ingress and egress access. It is agreed and understood this leased building containing approximately 28,000 square feet must be available not later than September 15, 1970, or the Tenant herein shall have the option of declaring this contract null and void and his first month's rent returned to him."

Mr. Moore was designated as rental agent with a commission of 5% of all rentals collected during the original term or any renewal term. The lease was duly signed by the parties and acknowledged by Acme.

A supplemental agreement, dated October 24, 1970, and also prepared by Mr. Moore, was executed by the parties on October 26, 1970, and provided:

"Acme Moving and Storage Corporation hereby agrees to extend the time for use and occupancy of the property under lease agreement dated June 30, 1970 by and between said Acme Moving and Storage Corporation and Donald W. Bower, Lessor, for a 30 day period from this date with the option of the Lessee to extend for an additional period at the option of the Lessee.

"This extension agreement does not alter any terms or conditions cited in said lease agreement dated June 30, 1970."

The option to rent the warehouse building under construction when the lease was executed was never exercised by Acme.

The landlord Bower had zoning difficulties which were resolved by the County Council of Prince George's County,

sitting as the District Council (District Council), granting C-2 (Commercial) zoning under the applicable zoning ordinance. However, it was necessary for him to obtain a special exception from the District Council to use the subject property for warehouses *wholly enclosed.* The District Council, on November 17, 1971, granted the special exception to use the property for *"WAREHOUSE, WHOLLY ENCLOSED,"* subject to 10 conditions in regard to fencing, landscaping, parking and vehicular access.

Condition 3 provided:

> "3. That a landscaping plan be submitted to the Prince George's Planning Board for approval. This plan shall provide for a mixture of deciduous and evergreen screening trees with a minimum height of eight feet at time of planting to be planted a maximum spacing of twelve feet on center on the residential side of the above-mentioned redwood fence."

The landlord Bower submitted a landscaping plan to the Planning Board for its approval. That Board disapproved the proposed landscaping plan and promulgated its own, which contained two provisions, *i.e.,* (1) that the chain link fence, six feet in height — which was required to be erected to wholly enclose the warehouses — be removed and (2) that the sidewalk next to the chain link fence, and which functioned as a retaining walk next to the buildings, should also be removed. The landlord was thus placed in the dilemma that if he complied with the landscaping plan approved by the Planning Board, he would not have a wholly enclosed warehouse as required by the zoning law and the special exception. In addition, the landlord testified that if the chain link fence were removed, it would expose the subject property to trespassers and vandals. There has already been some loss from vandals even with the chain link fence. Then, too, Mr. Bower stated, the sidewalk was required by the building permit department to keep trucks from backing over and damaging the chain link fence. As a result of this impasse between the two inconsistent

requirements, the landlord has not, and apparently will not, receive a use and occupancy permit for warehouse purposes.

No rent was paid by the tenant Acme although the landlord testified such payment had been requested.

The chancellor concluded that specific performance of the lease should not be granted for at least three reasons: (1) the lease was ambiguous in regard to its date of commencement and the possibility of the payment of advance rent; (2) the provisions of the extension agreement of October 24, 1970, destroyed the mutuality of the lease agreement; and, (3) it was impossible for the landlord to perform by obtaining the necessary use and occupancy permit because of the requirements of the Planning Board, on the one hand, and of the District Council, on the other.

We have concluded that the decree of November 3, 1972, should be affirmed. We need only consider the third ground on which the chancellor decided to deny specific performance and injunctive relief, i.e., impossibility of performance, although the two other grounds appear to have merit.

It is well settled in Maryland that the inability to obtain a necessary governmental permit to carry out a contract without the fault of the applicant will give rise to a defense of impossibility of performance if such interference was not foreseeable at the time of the execution of the contract and the risk was not assumed by the promisor. In *State, use of Lane v. Dashiell*, 195 Md. 677, 689, 75 A. 2d 348, 353-54 (1950), Judge Delaplaine stated for the Court:

"It is a general rule of the common law that when the impossibility of performance arises after the formation of the contract, the failure of the promisor to perform is not excused. This rule was founded on the theory that if the promisor makes his promise unconditionally, he takes the risk of being held liable even though performance should become impossible by circumstances beyond his control. The unjust consequences of this general rule gave rise to certain exceptions. One of these is

that a contractual duty is discharged where performance is subsequently prevented or prohibited by a judicial, executive, or administrative order, in the absence of circumstances showing either a contrary intention or contributing fault on the part of the person subject to the duty. *Wischhusen v. American Medicinal Spirits Co.*, 163 Md. 565, 572, 163 A. 685; *Fast Bearing Co. v. Precision Development Co.*, 185 Md. 288, 44 A. 2d 735; 2 Restatement, Contracts, sec. 458. But an order which interferes with the performance of the contract is not an excuse if the circumstances surrounding the formation of the contract are such as to indicate that the possibility of such interference was recognized and the risk of it was assumed by the promisor."

Our holding in *Dashiell* is in accord with the law generally. *See Ashland Oil and Refining Co. v. Cities Services Gas Co.*, 462 F. 2d 204 (10th Cir. 1972); *Savannah Print. Spec. & P. P. Loc. U. 604 v. Union Camp. Corp.*, 350 F. Supp. 632 (S.D. Ga. 1972); *Restatement of Contracts* § 458 (b) (1932); 84 A.L.R.2d 12 at 45, 76 (1962). *Cf. Harwell v. Growth Programs, Inc.*, 451 F. 2d 240 (5th Cir. 1971); *Bergman v. Parker*, 216 A. 2d 581 (D.C. App. 1966).

In the present case, the chancellor concluded in his oral opinion that the landlord Bower "just can't comply with the edicts of the two branches of the government that he is dealing with." We agree. It is clear from the lease, itself, as well as from the applicable law, that a use and occupancy permit to use and occupy the property for warehouse purposes is essential. There is no evidence that Mr. Bower was in any way at fault in not obtaining the use and occupancy permit and, indeed, the record shows cooperation by him in fulfilling the governmental requirements. He has been impaled upon the horns of an administrative dilemma through no fault of his own. There is no suggestion in the record that the refusal to issue the use and occupancy permit was foreseeable and that the landlord Bower

assumed the risk. Under these circumstances, the defense of impossibility of performance is properly available to him.

*Decree of November 3, 1972, affirmed, the appellant to pay the costs.*