Dear Delegate Flanagan:
You have requested our opinion on several issues related to the Maryland Stadium Authority ("MSA") and its contract with the Cleveland Browns:
1. What is the effect of an injunction issued by an Ohio court requiring the Browns to continue to play home games in Cleveland? What would be the effect if this preliminary injunction were to become a final order requiring the Browns to play in Cleveland through the 1998 season?
2. What is MSA's authority to enter an agreement pursuant to which MSA obligates itself to expend $200 million for the construction of a football stadium without an appropriation of sufficient funds by the General Assembly? Do §§ 7-235 and 7-237 of the State Finance and Procurement ("SFP") Article, Maryland Code, affect the authority of MSA in this regard? Specifically, does MSA's contract with the Browns "create a deficiency," "incur a liability," or "spend money" in excess of applicable appropriations in violation of SFP § 7-237?
3. What legislative action is required in connection with the lease and construction of the football stadium? When does such legislative action need to be taken?
4. What is the "stadium financing plan"? Did this plan exist at the time that the contract was executed? Does the financing plan assume that sports lotteries will generate a total of $102 million over the next three fiscal years? If this assumption "is patently incorrect," has MSA exceeded its authority by entering the contract with the Browns?
Our opinion is as follows:
1. An injunction requiring the Browns to remain in Cleveland through the 1998 season would excuse MSA's contractual obligation to complete construction of a football stadium for the 1998 season. Instead, the completion date would be 1999. Such an injunction would also excuse all parties from commitments related to the use of Memorial Stadium by the Browns during the 1996 and 1997 seasons. In so concluding, we are not predicting that a permanent injunction is likely to be entered by the trial court or, if entered, upheld on appeal. Nor, conversely, are we minimizing the serious impact that such an injunction would have on MSA and the Browns.
2. MSA was authorized by the Maryland Stadium Authority Act to enter the contract with the Browns. Once its financing plan is approved by the Board of Public Works, MSA will be authorized by that Act to sell bonds and use the bond proceeds, together with any other resources currently available to it, to begin construction of the football stadium. In order to complete the stadium, MSA will rely on appropriation of the proceeds of sports lotteries. If the General Assembly declines to appropriate the money, presumably the stadium will not be completed and, depending on the nature and timing of the appropriations decision, MSA might default on its bonds.
3. No further legislative action is required to validate MSA's contract with the Browns or to authorize MSA to sell bonds and use the proceeds to begin construction of the football stadium. Under MSA's financing plan, future legislative action will be required to complete the stadium — namely, the appropriation of sports lottery revenues.
4. The "stadium financing plan" referred to in the contract with the Browns is the "comprehensive financing plan" called for by § 13-712.1(2) of the Financial Institutions ("FI") Article, Maryland Code. This financing plan was submitted to the fiscal committees of the General Assembly and to the Board of Public Works on December 15, 1995. As amended on December 18, 1995, the financing plan assumes that annual sports lotteries will provide $96 million in revenue over the next three fiscal years. MSA has not exceeded its authority by relying on the lottery estimates in the plan, even if those estimates turn out to be incorrect.
 I Background
On October 27, 1995 MSA entered a Memorandum of Agreement (the "Agreement") with two corporate entities, the Cleveland Browns, Inc. and BSC, LLC, the intended lessee of the football stadium. Under the Agreement, MSA will build the Browns a football stadium at Camden Yards, to be completed in time for the 1998 season, and the Browns will play their home games there for 30 years.
Part B of the Agreement, embodying these commitments and various other details, is not yet effective. MSA's obligations "are subject to the approval by the Maryland Board of Public Works of this Agreement and MSA's financing plan for the Football Stadium." ¶ A4. The Board of Public Works has approved the Agreement but has not yet approved a financing plan.[1] The Browns' obligations under the Agreement "are subject to the approval of the NFL," which has not yet been given. Id.[2]
 II Ohio Court Injunction
Not long after the agreement was signed, the City of Cleveland filed suit in an Ohio trial court against the Cleveland Browns, Inc. and the lessee at Cleveland Municipal Stadium, Cleveland Stadium Corp. See City of Cleveland v. Cleveland Browns,Inc., Case No. 297833 (Court of Common Pleas, Cuyahoga Co.). On November 24, 1995, the trial court issued a preliminary injunction ordering the defendants to continue to perform their obligations under certain existing leases.[3] The court enjoined the defendants from "taking any actions which would cause the Cleveland Browns Professional Football Team [to play] home games in any other city or location but Cleveland, Ohio, until the Court has had an opportunity to render a final decision after a full trial on the merits."[4] If the City of Cleveland prevails at trial, the court will issue a permanent injunction ordering the Browns to play in Cleveland through the 1998 season.
The court's preliminary injunction and any permanent injunction that might be issued are events contemplated by theforce majeure clause, ¶ B26, of the Agreement:
 If any of BSC, the Team, or MSA is prohibited or prevented, directly or indirectly, from performing any of its obligations under this Agreement by reason of fire or other casualty, act of God, war, holocaust, riot, strike, labor dispute, boycott, intervention by civil or military government authorities, orders of the judiciary, rules of the NFL or any other cause whatsoever beyond the control of BSC, the Team, or MSA, as the case may be, the party so prohibited or prevented from performing shall be exonerated and excused from such performance until such time as the cause terminates or is removed. During such period of prevention or prohibition, the party so affected shall at all times act diligently and in good faith to bring about its termination as promptly as reasonably possible.
So long as this "order of the judiciary" remains in force, the Browns "shall be exonerated and excused" from performing its obligation under the agreement to play all of its home games in Baltimore starting with the 1996 season. ¶¶ B3, 5, 6 and 21.[5]
MSA's obligation under ¶ B1 of the agreement to build a football stadium for the Browns that will be ready at the start of the 1998 NFL regular season is inextricably linked to the Browns' playing in that stadium. An unforeseen delay in the move of the franchise, caused by circumstances beyond the control of any of the parties to the agreement, would excuse MSA's delay in the completion date, under both the force majeure clause in the Agreement and common law principles. See Schneider v. Saul,224 Md. 454, 168 A.2d 375 (1961). Once the injunction is lifted or expires by its own terms and the Browns are free to move, then the mutual obligations established by the Agreement would once again be effective. MSA would be obliged to complete the stadium for use in 1999.
 III MSA's Statutory Authority
MSA was legally authorized to enter into the Agreement because, under FI § 13-708(a)(10), MSA may "[e]nter into contracts of any kind, and execute all instruments necessary or convenient with respect to its carrying out its powers in this subtitle to accomplish the purposes of [MSA]." One of MSA's key purposes is to build a stadium "for the primary purpose of holding professional football games . . . ." FI § 13-701(c). Furthermore, under FI § 13-708(a)(16), MSA may "[e]xercise all the corporate powers granted Maryland corporations under the Maryland General Corporation Law"; under the General Corporation Law, corporations may "[m]ake contracts and guarantees . . . ." § 2-103(5) of the Corporations and Associations Article.
To enable baseball and football stadiums to be built, the General Assembly in 1987 enacted what the Court of Appeals called "a finely tuned law." Kelly v. Marylanders for Sports Sanity,310 Md. 437, 460, 530 A.2d 245 (1987). This law contained "an intricate financing mechanism to permit the State to receive and expend public monies required to obtain a site and to construct the contemplated sports facilities in the public interest." Id.
Subject to the prior approval of the Board of Public Works, MSA "may at any time . . . issue bonds for any corporate purpose. . . ." FI § 13-712(a)(1)(i). These bonds are "payable solely from the property or receipts" of MSA. FI § 13-712(a)(2). MSA may not close on the sale of bonds to finance the football stadium unless it:
 (1) Has certified to the Legislative Policy Committee and the Board of Public Works that [MSA] has endeavored to maximize private investment in the sports facility proposed to be financed, and, with respect to a baseball or football stadium, to maximize the State's ability to assure that the professional baseball and football franchises will remain permanently in Maryland. This certification shall be supported by a detailed report outlining these efforts;
 (2) Has provided to the fiscal committees of the General Assembly, at least 30 days prior to seeking approval of the Board of Public Works for each bond issue or other borrowing, a comprehensive financing plan for the relevant segment of the facility and the effect of this financing plan on financing options for other segments of the facility, including anticipated revenues from private investment where applicable;
 (3) Has obtained the approval of the Board of Public Works of the proposed bond issue and the plan for financing; [and]
 (4) Has secured, as approved by the Board of Public Works, . . .
 (ii) With respect to site acquisition and the construction of football stadium, a franchise for a National Football League Team and a long-term lease.
FI § 13-712.1. As to the last of these requirements, the Agreement, once final, is a "long-term lease." See Letter from Attorney General Curran to John A. Moag, Jr., Esquire, MSA Chairman (October 27, 1995).
Thus, MSA acted under existing law when it signed the Agreement. MSA needs no additional legislation to sell bonds and use the proceeds (and other funds presently available to it) to begin construction of the football stadium. If the General Assembly determined to prevent MSA from starting construction, it would have to modify or repeal current law.[6]
Once MSA issues the bonds, obviously it will need a stream of revenue over the life of the bonds to service the debt. The special fund that is the source of debt service is the Maryland Stadium Authority Financing Fund, "a nonlapsing revolving fund for carrying out the provisions of this subtitle related to sports facilities and other facilities at Camden Yards." FI § 13-715(b). The following receipts are placed in the Financing Fund:
 (1) Proceeds from the sale of bonds related to sports facilities;
 (2) Revenues collected or received from any source under the provisions of this subtitle related to Camden Yards facilities;
 (3) Admissions and amusement tax revenues distributed to [MSA] under the Tax-General Article;
 (4) Any other revenues related to Camden Yards facilities, under the jurisdiction of [MSA]; and
 (5) Any additional revenue, gift, donation, or other source authorized by law related to Camden Yards facilities.
FI § 13-715(b). MSA "shall pay all expenses and make all expenditures related to Camden Yards facilities" from the Financing Fund. FI § 13-715(d).
The State Lottery is an "additional revenue . . . source authorized by law related to Camden Yards facilities":
 (a) During each fiscal the [Lottery] Agency shall conduct at least 2, but no more than 4, sports lotteries for the benefit of the Maryland Stadium Authority.
 (b) In all advertising and on tickets, the agency shall identify any lottery under this section as being conducted for the benefit of the Maryland Stadium Authority.
§ 9-120.1 of the State Government Article, Maryland Code. Seegenerally 80 Opinions of the Attorney General ___ (1995) [Opinion No. 95-053 (November 29, 1995)]. The revenue from these lotteries is appropriated annually to the Maryland Stadium Facilities Fund, "a special, nonlapsing fund that consists of moneys that may be appropriated, transferred, credited, or paid to it from any source." SFP § 7-312(b)(1). The Facilities Fund is a key revenue source for MSA:
 Moneys credited to the Maryland Stadium Facilities Fund may be used, in accordance with approved comprehensive financing plans, to:
 (1) pay rent to the Maryland Stadium Authority;
 (2) with the approval of the Board of Public Works, make grants or loans, not exceeding $1 million in any fiscal year, to [MSA] for its corporate purposes;
 (3) with the approval of the Board of Public Works, finance capital construction in lieu of issuing bonds; or
 (4) financially support, through equity investment, loan, guarantee, or otherwise, full or partial private financing of any element of the facility.
SFP § 7-312(e)[7]. Money in the Facilities Fund is ordinarily transferred to the Financing Fund by budget amendment under SFP § 7-209.
Therefore, the General Assembly has ultimate control over a critical source of financing for the football stadium. Pursuant to its authority under Article III, § 52(6) of the Constitution, the General Assembly is free in any budget bill to strike or condition the appropriation of lottery revenues to the Facilities Fund.[8] Such a decision might have significant implications, depending on its timing and terms — for example, by causing MSA to default on bond obligations. Nevertheless, that ultimate policy decision is left to the General Assembly.
 IV Unfunded Contractual Liabilities
As Attorney General Sachs wrote nearly a decade ago, "both the Constitution and the statutes require a link between contractual commitments and appropriations. Thus, Article III, § 32 of the Constitution, which prohibits the withdrawal of money from the Treasury `except in accordance with appropriation by law,' applies to any binding commitment for the payment of State funds and requires that multi-year contracts be made contingent upon future appropriations." 71 Opinions of the Attorney General
274, 278 (1986). SFP § 7-237, which "applies to any officer or agent of the State who is charged with . . . construction, improvement, or maintenance of a building or work . . . or . . . management of or provision for a State institution," generally prohibits contracts in excess of appropriations:
 An officer or agent to whom this section applies may not:
 (1) make or participate in making for any purpose a contract that purports to bind the State to pay any amount unless money has been appropriated for that purpose and remains unspent;
(2) create a deficiency; or
 (3) incur a liability or spend money in excess of the applicable appropriation.
SFP § 7-237(b).
MSA's contract with the Browns does not violate this prohibition, however, because MSA's commitment to pay for the football stadium explicitly states that construction will be "in accordance with, and subject to the budget established by, MSA's approved financing plan for the football stadium . . . ." ¶ B1. The parties agreed that the stadium would be an "open-air, natural grass, state-of-the-art, football facility . . ." with a seating capacity of around 70,000. Exhibit Two to the Agreement, at 1 and 3. The parties knew that the cost of such a stadium, estimated at about $200 million, would vastly exceed the proceeds of bond sales alone, given the $80 million limit in FI § 13-712(a)(1) on the amount of indebtedness that can be outstanding for construction of a new football stadium. Nor could the parties have reasonably believed that MSA could conceivably generate sufficient non-appropriated revenues to fill that gap.
Consequently, the Agreement's reference to "the budget established by [the] approved financing plan" can only be construed as a recognition that appropriated funds — that is, the proceeds of sports lotteries — would be a part of the construction budget for the stadium. And, indeed, the actual financing plan recently submitted to the fiscal committees and the Board of Public Works does contemplate appropriated lottery revenues as a part of the financing package. See Part V below.
In short, MSA's commitment to build the stadium was made contingent on the availability of appropriations as contemplated in the financing plan. A contractual undertaking made contingent on future appropriations does not violate SFP § 7-237. The language in the Agreement "preserve[s] the discretion of both the Governor and the General Assembly" in the preparation of the annual budget bill. 71 Opinions of the Attorney General 274, 280 n. 7 (1986).[9]
MSA, to be sure, will be obliged under the last sentence of ¶ B26 to use its best efforts to obtain needed appropriations. Yet if, despite these efforts, the future appropriations relied on in the financing plan do not materialize and the construction project ends for want of sufficient funding, both MSA and the Browns will be relieved of their obligations under the Agreement. Action by the Governor or the General Assembly to eliminate appropriations for stadium construction would come within the force majeure
clause of the Agreement; such action would be an "intervention by civil . . . government authorities" and a "cause . . . beyond the control of . . . . MSA." ¶ B26. MSA has no control over what the Governor or the General Assembly might do, in the exercise of their constitutional prerogatives in the budget process. Hence, if MSA failed to complete a football stadium because legislative action over the budget prevented it from doing so, it would be, in the words of the Agreement, "exonerated and excused from such performance." See Acme Moving StorageCorp. v. Bower, 269 Md. 478, 483, 306 A.2d 545 (1973); FastBearing Co. v. Precision Development Co., 185 Md. 288, 308,44 A.2d 735 (1945); Wischhusen v. American Medicinal Spirits Co.,163 Md. 565, 572-73, 163 A. 685 (1933); Damazo v. Neale,32 Md. App. 536, 363 A.2d 252 (1976). See generally 18 Samuel Williston, ATreatise on the Law of Contracts § 1938 (1978).[10] Cf.Johnson v. Frisbie, 29 Md. 76, 83 (1868) ("[I]t is well established, that persons dealing with [government] agents or officers in regard [to public property], are bound to know the extent of their authority.").
 V Financing Plan
As discussed in Part II above, MSA must obtain approval from the Board of Public Works of "a comprehensive financing plan" for the football stadium before MSA may close on the sale of bonds. FI § 13-712.1(2). MSA submitted this financing plan on December 15, 1995, and amended it in one respect on December 18, 1995.[11]
Under the plan, the total project cost for the football stadium will be $200 million. The plan anticipates receipt of some $86 million during the current fiscal year through the sale of bonds. MSA's current cash balance, interest earnings, and other non-appropriated revenue sources also figure in the plan.
With respect to lottery proceeds, the plan estimates receipts of $20.8 million during the current fiscal year. For each of the next three fiscal years, the plan (as amended) estimates lottery proceeds at $32 million annually, for a total of $96 million during that period. The plan estimates lottery proceeds in fiscal year 2000 at $22 million.
The financing plan does not detail the underlying basis for these estimates of lottery proceeds. As we understand it, MSA derived the estimates after consultation with the State Lottery Agency, based upon its marketing expertise. The financing plan thus reflects a good-faith judgment on the part of the MSA board members. The MSA board, like other decision-makers, "has the responsibility and the discretion to act on the facts and information at its disposal," even if the information depends on experts' predictions as to which "there can be no guarantee that what they predict for the future will actually occur." MarylandState Teachers Ass'n, Inc. v. Hughes, 594 F. Supp. 1353, 1371 (D. Md. 1984), aff'd, No. 84-2213 (4th Cir. December 5, 1985), cert.denied, 475 U.S. 1140 (1986).
Public officials are presumed to carry out their duties in good faith. See, e.g., Gonzales v. Defense Logistics Agency,772 F.2d 887, 889 (Fed. Cir. 1985). Cf. Moberly v. Herboldsheimer,276 Md. 211, 217, 345 A.2d 855 (1975) (stating the principle that "an act of a public official" is to be construed as constitutional whenever reasonably possible). Once the plan is approved by the Board of Public Works, it will have the legal effect contemplated by statute.
 VI Conclusion
In summary, it is our opinion that MSA acted lawfully in entering the Agreement with the Browns and has authority to construct the football stadium at Camden Yards in accordance with an approved financing plan. MSA took no action inconsistent with the General Assembly's prerogative to change substantive law or appropriate budgeted funds annually.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Jack Schwartz Chief Counsel Opinions Advice
[1] MSA intends to seek Board approval of the financing plan on January 17, 1996. The plan is discussed in more detail in Part V of this opinion.
[2] The NFL's approval is expected on the same day, January 17, 1996.
[3] In 1974, the owners of the Browns agreed to use Cleveland Municipal Stadium for all regular season home football games for at least 25 years. Lease by Way of Concession Between the City of Cleveland and Cleveland Stadium Corp. § 29. The same commitment was reflected in a sublease between Cleveland Stadium Corp. and Cleveland Browns, Inc.
[4] Trial is scheduled to begin on February 12, 1996.
[5] The Browns are to play in Memorial Stadium while the Camden Yards stadium is under construction. ¶ B3.
[6] In the absence of specific language, we decline to speculate whether legislation of this kind could be given effect as emergency legislation. See 80 Opinions of the Attorney General
___ (1995) [Opinion No. 95-008 (March 15, 1995)]; 69 Opinions ofthe Attorney General 271 (1984).
[7] A detailed description of the background and purpose of the Facilities Fund may be found in 73 Opinions of the AttorneyGeneral 276 (1988).
[8] The current fiscal year's appropriation for the Stadium Authority contains a prerequisite to the crediting of $20 million dollars to the Facilities Fund. Item 23.01.03.02. This prerequisite — a long-term lease with an NFL team — will have been satisfied when the agreement with the Browns becomes fully effective.
[9] For the same reasons, the Agreement does not violate SFP § 7-235, which prohibits an agency from "adopt[ing] a rule or regulation or tak[ing] any other administrative action that would result in expenditures in excess of the limitations in the State budget. . . ."
[10] Williston writes: "`There is appended to all contracts an implied condition that after the making of the agreement, no law or governmental regulation will be enacted rendering continued performance of the contract unlawful. Therefore, where without fault of the party his continued performance of a contract is rendered illegal by a subsequent governmental regulation, his duty in rendering performance is discharged.' It may be said broadly that where the law forbids or prevents the performance of a promise, legal when made, the promisor is freed from his original obligation, and there is no further liability of any kind." Id. (quoting Burkus v. Henshall, 126 A.2d 722, 725 (Pa. 1956)).
[11] The financing plan was prepared on behalf of MSA by Public Financial Management, Inc.
 *Page 232