374 F.Supp. 95 (1973)
In re MUTUAL FUND SALES ANTITRUST LITIGATION.
Genevieve M. HADDAD, Plaintiff,
v.
The CROSBY CORPORATION et al., Defendants.[*]
UNITED STATES of America, Plaintiff,
v.
The NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC., et al., Defendants.[**]
Arthur GROSS, Joseph Lerman, and Rose Lerman, on behalf of themselves and all other individual mutual fund shareholders similarly situated, Plaintiffs,
v.
The NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC., et al., Defendants.[***]
Civ. A. No. Misc. 103-73. Civ. A. No. 2454-72, 338-73, 426-73.
United States District Court, District of Columbia.
December 14, 1973.
*96 Carl W. Schwarz, Daniel R. Hunter, Dept. of Justice, Charles Jay Pilzer, Washington, D.C., David Berger, Philadelphia, Pa., for plaintiffs.
Daniel P. Levitt, (Liaison Counsel) Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, Lloyd J. Derrickson, Washington, D.C., for defendants.

MEMORANDUM OPINION
CORCORAN, District Judge.

I

THE NATURE OF THE CASE
The above-captioned lawsuits are civil actions alleging violations of the federal antitrust laws in connection with the distribution of securities of openend management investment companies ("mutual funds").[1] The operations of such companies are governed generally by the Investment Company Act of 1940[2] (the 1940 Act).
In Civil Action No. 2454-72, plaintiff Haddad purports to sue on behalf of a class and subclass of mutual fund investors. Haddad alleges violations of the antitrust laws [Sherman Act, Sections 1-3, 15 U.S.C. §§ 1-3] and the securities laws [Securities Exchange Act of 1934, Section 10(b), 15 U.S.C. § 78j (b); Exchange Act Rule 10b-5, 17 C.F. R. § 240.10b-5 (1972)]. The antitrust claim is that the various defendants, including underwriters of and dealers in mutual fund shares and unnamed co-conspirators have agreed, combined and conspired to inhibit, or to refuse to participate in, transactions as agents or brokers in mutual fund shares at prices below the applicable public offering prices established in the prospectuses of such mutual funds and have placed unreasonable restraints upon the transferability of such shares. In essence, the securities claim is that there is a failure to disclose the alleged antitrust violations and that such failure constitutes an independent violation of the securities laws. Haddad alleges damages to her and her purported class of undetermined millions of dollars. Haddad's antitrust claim requests treble damages and injunctive relief. The securities *97 claim requests actual damages, punitive damages, and injunctive relief.
Civil Action No. 338-73 is brought by the Antitrust Division of the U.S. Department of Justice. The complaint alleges violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The gist of the complaint is that defendants National Association of Securities Dealers (NASD)[3] funds and dealers have participated in agreements, combinations, and conspiracies, the effect of which has been to inhibit a "market" for "brokerage transactions" and thereby to suppress the growth of a "secondary market in mutual fund securities," and to cause the public to pay artificial and non-competitive sales loads for mutual fund shares. The government complaint seeks only prospective, injunctive relief.
Civil Action No. 426-73, the Gross case, is another private antitrust suit and purported class action which substantially duplicates the government allegations in No. 338-73. This action seeks injunctive relief and treble damages for injury to the purported plaintiff class over an indeterminate past period.[4]
The individual defendants in each case are principal underwriters[5] or broker-dealers[6] in mutual fund shares.[7] Additionally the NASD is named as a defendant in all three cases. In each case the defendants have moved to dismiss the complaints, pursuant to Fed.R. Civ.P. 12(b) on the grounds:
(a) That as a matter of law, Section 22(d) of the Investment Company Act of 1940, 15 U.S.C. § 80a-22(d), establishes a system of fixed, retail price maintenance in the distribution of investment company securities which is totally inconsistent with antitrust concepts and which accordingly creates, as Congress clearly intended, an exemption and immunity from antitrust liability for the defendant dealers' conduct in maintaining *98 the fixed, public offering price of such securities;
(b) That as a matter of law, Section 22(f) of the Investment Company Act of 1940, 15 U.S.C. § 80a-22(f), sanctions contractual restrictions on the transferability or negotiability of investment company securities, subject to supervision of the Securities and Exchange Commission (SEC), which restrictions are totally inconsistent with antitrust concepts and which restrictions, therefore, as incorporated in the defendant dealers' publicly-filed investment company sales agreements, are exempt and immune from antitrust liability; and
(c) That by the Investment Company Act of 1940, Congress subjected the acts and practices of the defendant dealers in the distribution of investment company securities to continuous and pervasive regulation by the SEC as well as NASD acting under the SEC's supervision; and, accordingly, the SEC has exclusive jurisdiction to regulate those acts and practices, and such acts and practices are exempt and immune from the claims herein alleged as violations of the Federal antitrust laws.
The motions were consolidated for argument.[8]

II

THE REGULATION OF MUTUAL FUNDS
The dispute can only be determined ultimately by an analysis of the several subsections of Section 22 of the 1940 Act and an antitrust exemption purportedly given by Section 15A(n) of the Securities and Exchange Act of 1934 (the Maloney Act) [15 U.S.C. § 78o-3(n)]. Before reaching that point, however, it would seem appropriate to view the overall regulatory scheme imposed by Congress on investment companies through the 1940 Act.
It became apparent to the Congress in 1935 that the disclosure and antifraud provisions of the Securities Act of 1933 (the 1933 Act) and the Securities Exchange Act of 1934 (the 1934 Act) were not adequate for the regulation of investment companies. Accordingly, it directed the SEC to make a comprehensive study of the investment company industry with a view to proposing corrective legislation. The SEC did so[9] producing a draft "Investment Trust Bill" which was the subject of hearings conducted by a Senate subcommittee.[10] Representatives of the investment company industry were invited to participate in the hearings. Ultimately a compromise bill emerged which finally became law as the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq.[11]
The 1940 Act brought many investment companies within the disclosure requirements of the federal securities laws for the first time. It tightened up those requirements and tailored them to prohibit certain undesirable practices in the investment company industry. Presently, pursuant to the 1940 Act investment companies must register themselves (§§ 7 and 8) and their shares [§ 24(a)] with *99 the SEC, update periodically their filings with quarterly and annual reports [§§ 30(a)-(c)], and submit prospectuses and sales literature to the SEC [§ 24 (b)]. Companies must issue to their shareholders, at least semi-annually, financial reports containing specific types of information [§ 30(d)].
The 1940 Act also imposes detailed restrictions upon investment company structure, conduct, financial policies, and dealings with and by affiliates.[12]
In 1938 (prior to the enactment of the 1940 Act), the Congress had amended the 1934 Act through the passage of the so-called "Maloney Act," 15 U.S.C. § 78o-3. The Maloney Act provided for the registration with the SEC of a national securities association with rulemaking power upon the finding by the SEC that:
the rules of the association are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to provide safeguards against unreasonable profits or unreasonable rates of commissions or other charges, and, in general, to protect investors and the public interest, and to remove impediments to and perfect the mechanism of a free and open market; and are not designed to permit unfair discrimination between customers or issuers, or brokers or dealers, to fix minimum profits, to impose any schedule of prices, or to impose any schedule or fix minimum rates of commissions, allowances, discounts, or other charges.[13]
When Congress enacted the Maloney Act in 1938 it specifically provided:
If any provision of this section is in conflict with any provision of any law of the United States in force on June 25, 1938, the provision of this section shall prevail. 15 U.S.C. § 78o-3(n).
The defendant NASD is the only securities association registered with the SEC under the Maloney Act.
By § 22(a) of the 1940 Act, Congress gave the NASD, as a registered national *100 securities association, the power to promulgate rules setting the minimum price at which its members may buy redeemable fund shares from a fund, the maximum price at which its members may resell to or redeem with a fund, and the minimum period which must elapse after sale before a member may resell to or redeem with a fund. The SEC can exercise its overall supervisory power to promulgate rules superseding NASD's rules on sale, redemption and repurchase prices, holding periods, and sales loads [§ 22(c) 1940 Act].
Section 22(b)(1) of the 1940 Act empowers the NASD to adopt rules prohibiting members from charging "excessive" sales loads, provided that such rules "allow for reasonable compensation for sales personnel, broker-dealers, and underwriters."[14] In so doing the NASD is expressly freed from a provision[15] in the Maloney Act which had prohibited it from issuing rules designed to impede "a free and open market," "fix minimum profits," "impose any schedule of prices," or "impose any schedule or fix minimum rates of commissions, allowances, discounts, or other charges." Section 22(b)(3) of the 1940 Act, added in 1970, authorizes the SEC to alter and supplement the NASD's Section 22(b)(1) rules.[16] And in 1970, Congress added Section 22(b)(4) to the 1940 Act to the effect:
If any provision of this subsection is in conflict with any provision of any law of the United States in effect on December 14, 1970, the provisions of this subsection shall prevail. 15 U.S. C. § 80a-22(b)(4).
An investment company, its principal underwriter, and its dealers are prohibited from selling redeemable securities for distribution to the public except at a current public offering price described in the prospectus [§ 22(d)]. Dealers and principal underwriters may, however, sell such securities to other dealers, the principal underwriter or the fund at other than a public offering price. (Id.)
An investment company may restrict the transferability and negotiability of its shares, but only insofar as that is done in conformity with the company's registration statement and not in contravention of SEC rules [§ 22(f)].[17]
By rules and regulations upon its own motion and by order upon application, the Commission may conditionally or unconditionally exempt persons, securities, or transactions, or classes thereof, from any provision in the Act or any rule or regulation thereunder, to the extent such exemption is in the public interest and *101 not inconsistent with investor protection and the Act's purposes [§ 6(c)].[18]
Finally, no person may be held liable for any act done in conformity with an SEC rule, regulation, or order which is later invalidated [ § 38(c) ].
Since 1940, the SEC has actively regulated the pricing and distribution of mutual fund shares. The Commission has promulgated a rule[19] for calculating fund share prices. It has promulgated another rule[20] allowing discount sales to certain groups and individuals and has periodically proposed[21] and adopted[22] amendments to this rule. It recently proposed a third rule[23] relating to no-load exchange privileges for fund shareholders who wish to switch to other load funds. The Commission has entertained a wide variety of applications for exemption from these rules and the relevant statutory sections and has granted some of these applications.[24] SEC administrative proceedings have barred both underpricing and overpricing of fund shares.[25]
The SEC has approved NASD Rule 26 which regulates in great detail the distribution, redemption, and repurchase of mutual fund shares.[26] The rule[27] says, inter alia, that principal underwriters must require their dealers to sign selling agreements containing certain restrictive provisions, that sales loads may not be "unfair," that the public offering price must be calculated in a particular fashion, that dealers and underwriters may not withhold customers orders or accumulate inventories, that certain conditional orders are barred, that the fund may not redeem at prices above net asset value, that sales loads must be refunded if the purchasers redeem soon after purchase, that fund shares may not be purchased at prices lower than the fund's next-quoted bid, and that non-contract dealers may not sell their shares back to the fund unless they are record owners of the shares. The SEC has supervised NASD enforcement of this rule and reviewed NASD enforcement proceedings.[28]
For more than three decades, since the enactment of the 1940 Act, the aggreements between dealers and principal underwriters, and between principal underwriters *102 and mutual funds, have been filed with the SEC. The agreements are filed under both the 1933 Act and the 1940 Act.[29] The Investment Trust Study of 1940 described such agreements in detail.[30] The 1940 Act specifically calls for written contracts between funds and their principal underwriter [§ 15(b)]. As noted above, the Commission has approved a NASD rule which requires dealer-underwriter agreements; and Commission decisions have frequently turned on particular provisions of the dealer-underwriter agreements.[31]

III

THE OPERATION OF A MUTUAL FUND: RESALE PRICE MAINTENANCE
We look briefly at the manner in which a typical mutual fund operates within the foregoing framework.[32]
A mutual fund is an investment company which invests in the securities of other corporations and issues and has outstanding common stock representing an interest in the assets of the fund. The owner of the stock of the fund is entitled, on demand, to receive from the fund his proportionate share of the market value of the fund's net assets. To insure that the fund has sufficient cash or liquid assets on hand to meet current redemptions, the fund offers its common stock continuously. The offering price per share consists of the "net asset value" per share, computed daily, plus a sales charge or "load." The viability of a fund thus depends upon a distribution system which will effect continuous sales at prices which will support current redemption demands.
The primary distribution of the shares of a fund is controlled for the most part by § 22(d) of the 1940 Act and follows a basic pattern throughout the industry, i. e., (1) a fund enters into a contract with a principal underwriter who has the exclusive right to purchase the shares from the fund; (2) the principal underwriter acts only as a wholesaler supplying shares to retail dealers; (3) the retail dealers, who sell the shares to the investing public, are bound by contracts, commonly known as uniform sales agreements, with the principal underwriter which require that those dealers shall not sell at other than the public offering price, thus insuring that the price of the fund shares will not be the subject of competition among sellers of shares in the same fund; (4) the sales charge or "load" (which usually amounts to 7.5% to 8.5% above net asset value) is split between the underwriter and the dealer making the sale while the fund receives the net asset value component of the public offering price; and (5) when the shares are redeemed by the fund, as they must be upon demand, the redemption price is the net asset value prevailing at the time of redemption.
It is obvious from the foregoing outline of marketing procedures that the sale and distribution of mutual fund shares is accomplished through a retail price maintenance system which is patently repugnant to the free and open competition requirements of the Sherman Act. This price maintenance scheme, however, does not operate in a vacuum. Rather, it is expressly immunized from the otherwise applicable antitrust laws by virtue of the provisions of the 1940 Act and the Maloney Act. As the SEC recently reported to Congress, "Section 22(d) is an exception to the *103 usual congressional policy, expressed in the antitrust laws, against price fixing.[33]
It has been authoritatively recognized that the Maloney Act, superimposed upon the regulatory scheme of the 1940 Act, provides a limited immunity for participants in the primary distribution system of mutual fund shares under SEC-approved NASD rules. That exemption[34] was noted by Mr. Justice Frankfurter in his dissenting opinion in International Association of Machinists v. Street, 367 U.S. 740, 809-10 n. 16, 81 S.Ct. 1784, 1820, 6 L.Ed.2d 1141 (1961):
The Maloney Act of 1938 added § 15A to the Securities Exchange Act of 1934. 52 Stat. 1070, 15 U.S.C. § 78o-3. In order to be registered, a number of statutory standards must be met. The statute specifically requires that an association's rules provide for democratic representation of the membership and that dues be equitably allocated. See § 15A(b)(5) and (6). Only one association, the National Association of Securities Dealers, Inc., has ever applied for or been granted registration. NASD membership comprises roughly three-quarters of all brokers and dealers registered with the Securities and Exchange Commission. Loss, Securities Regulation 766-67 (1951 Supp.1955). Sections 15A(i) and (n) of the Act authorize the NASD to formulate rules which stipulate that members shall refuse to deal with non-members with immunity from the antitrust laws. See S.Rep. No. 1455, 75th Cong., 3d Sess. 8-9 (1938); Loss, op. cit., supra, 769-770. The Commission has stated that it is "virtually impossible for a dealer who is not a member of the NASD to participate in a distribution of important size." National Association of Securities Dealers, Inc., 19 S.E.C. 424, 441.
Again, in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 227 n. 60, 60 S.Ct. 811, 846, 84 L.Ed. 1129 (1940), Mr. Justice Douglas stated:
It should be noted in this connection that the typical method adopted by Congress when it has lifted the ban of the Sherman Act is the scrutiny and approval of designated public representatives. Under the N.I.R.A. this could be done through the code machinery with the approval of the President as provided in §§ 3(a) and 5, supra note 18. Under § 407(8) of the Transportation Act of 1920, [41 Stat. 482; 49 U.S.C. § 5(8)], carriers, including certain express companies, which were consolidated pursuant to any order of the Interstate Commerce Commission were relieved from the operation of the Antitrust Laws. And see the Maloney Act (§ 15A of the Securities Exchange Act of 1934, 52 Stat. 1070, 15 U.S.C.A. § 78o-3) providing for the formation of associations of brokers and dealers with the approval of the Securities and Exchange Commission and establishing continuous supervision by the Commission over specified activities of such associations . . . . (Emphasis added.)
The plaintiffs recognize a limited antitrust immunity accorded to the primary distribution system. The gravamen of their complaints, however, is that the defendants have conspired to use the primary distribution system to foreclose the development of a secondary market in mutual fund shares. This is allegedly accomplished through the use of the uniform sales agreements mentioned *104 above, which even after the primary distribution of the shares, set the price at which the shares shall thereafter be sold, thus precluding the dealers from selling shares as brokers in a brokerage market or as dealers in a secondary dealer market in which marketplace conditions and arms-length bargaining would be the price-setting factors. The plaintiffs insist that Congress, while allowing the primary market to flourish with benefit of antitrust immunity, did not intend to foreclose secondary market growth, but that such secondary markets are in fact being discouraged and suppressed by certain NASD rules and the restrictive provisions contained in the industry-wide uniform sales agreements between principal underwriters and dealers.

IV

SECTION 22, 1940 ACT
The fact that a secondary market is to all intents and purposes nonexistent might seem to substantiate the plaintiffs' claims. However, the position of the plaintiffs fails to take into account that the creation and maintenance of a free and open secondary market would be totally inconsistent with and might destroy the primary marketing system that is created by the 1940 Act, and particularly by § 22(d), the repeal of which has several times been urged upon Congress with no success. It is an economic fact, recognized by Congress, that the two marketsthe primary market described in Part III supra, and a secondary market as urged by the plaintiffscannot co-exist and both remain viable. Having established a resale price maintenance system in the primary distribution system in which ordinary competitive influences cannot operate, Congress has rejected all attempts to foster a secondary market which might operate to the detriment of the primary market.
In support of those conclusions we look to the legislative history of the key sections of the 1940 Act and to the congressional intent in enacting that legislation.

A. Section 22(d)

Section 22(d) provides in pertinent part,
. . . no principal underwriter of such security and no dealer shall sell any such security to any person except a dealer, a principal underwriter, or the issuer, except at a current public offering price described in the prospectus.
As written, and as applied, that language clearly contemplates a congressionally sanctioned retail price maintenance system which is inconsistent and in conflict with the antitrust laws so far as underwriters and dealers are concerned.
Plaintiffs assert, however, that since the term "broker" or "broker-dealer" is not used in the subsection, that 22(d) permits a person to sell to another through a broker at a price less than the specified public offering price for the same shares, and that the absence of a significant brokerage market in those shares implies the existence of conspiratorial anti-competitive activity on the part of defendants to prevent the growth of that market.
This argument, however, ignores the price maintenance purpose of § 22(d) and its corollary that there must not be price discrimination between similarly situated investors.
On this latter point, so far as this Court is aware, there is no SEC or SEC staff pronouncement which can be construed to sanction price discrimination between similarly situated investors. To the contrary the SEC has said:
The purposes of the Section [22(d)] are to prevent discrimination among purchasers and to provide for orderly distribution of such shares by preventing their sale at a price less than that fixed in the prospectus. Investment Company Release No. 2798 (December 2, 1958). See also Investment Company Release Nos. 8816 (February *105 13, 1970); 2718 (May 29, 1958); 89 (March 13, 1940). See In the Matter of Investors Diversified Service, 39 SEC 680 (1960).
Again, in its most recent annual report the SEC has stated:
Section 22(d) precludes the sale to public investors of redeemable investment company securities which are being currently offered to the public on or through an underwriter except at a current public offering price described in the prospectus. SEC, Thirty-eighth Annual Report 97.
Thus, the language of the statute, its legislative history and subsequent interpretation by the SEC all indicate that its object was to allow the pre-1940 method of mutual fund share distribution to continue subject to the changes necessary to suppress what was sometimes dubbed the "bootleg" market. Greene, The Uniform Offering Price of Mutual Fund Shares Under the Investment Company Act of 1940, 37 U.Det.L. J. 369, 371 (1960); In the Matter of Spiro Sideris, Securities Exchange Act Release No. 8816 (Feb. 13, 1970).
The legislative history of § 22 indicates that in the pre-1940 period there was in fact a secondary market in mutual fund shares, a market very similar in size and scope as that for which plaintiffs here attempt to make a case.[35] This marketthe "bootleg market" was being maintained by brokers and dealers who were not under contract with the issuers or underwriters and who were not, accordingly, a part of the established distribution system of any given fund.
Those non-contract broker-dealers, without the authority of fund underwriters and in competition with authorized retail distributors of mutual fund shares, were buying shares in the market directly from shareholders at a price slightly above the published redemption price and reselling them to investors at prices lower than those fixed by the funds' principal underwriters.[36] Contract dealers operating in the primary distribution-system, on the other hand, were obligated by their distribution contracts to sell fund shares at the price (including the sales charge) set by the principal underwriters.
Thus, non-contract dealers were effectively by-passing the primary distribution system and retaining for themselves the selling commissions in full.[37] If investors bought in the secondary market but redeemed through the fund, it was feared that redemptions would exceed sales of new shares and the fund would no longer have the cash available to satisfy its redemption obligations. Thus if the proceeds of new sales did not accrue to the fund, forced liquidation might result.
The congressional response to the problems of the pre-1940 market conditions *106 was § 22. By § 22(f), infra, a fund was given the right to limit transferability. By § 22(d), all dealers were required to maintain the public offering price in sales to the public. The effect of the Act was for the first time to bind non-contract dealers to the public offering price. A stated purpose of § 22(d) was to insure that "no securities issued by an investment company shall be sold to insiders or to anyone other than an underwriter or dealer except on the same terms as are offered to other investors."[38]
This was a clear recognition that cut-price competition resulted in discrimination between similarly situated investors.
"Another factor in the decision to give statutory sanction to price fixing in 1940 was the fact that mutual fund distribution was then and for many years thereafter conceived of as a specialized type of underwriting, and underwriting was regarded as a field in which the law sanctioned price fixing." 1967 Senate Hearings 153-54 (Chairman Cohen). Cf. United States v. Morgan, 118 F. Supp. 621, 697 (S.D.N.Y.1953).
As alluded to supra, a very real danger of the "bootleg" market was that its short term price advantage would drain profits from the primary distribution system and leave the issuers unable to engage in continuous sales of new securities necessary for long-term growth and the financial health of a fund. According to one commentator, a purpose of the price maintenance provisions was "to prevent the cut-price competition which had then been making serious inroads upon the contractual distribution system of the mutual fund underwriting firms." Greene, Uniform Offering Price, supra, 37 U.Det.L.J. at 371.
Section 22(d) has been reconsidered by Congress several times. Its modification or repeal has been urged. Congress has consistently refused to modify or repeal it, and in the course of hearings on various proposals, the position of the SEC and the congressional intent are clearly reflected. For example, in 1967 Congress was re-examining the problems of public offering prices and sales loads. It was being urged that competition for sales loads could only be realized by a repeal of 22(d). While testifying before the Senate Committee, then-Chairman of the SEC Cohen remarked:
However, this argument [that 22(d) be repealed to allow competition] overlooks a fundamental theme of state and federal securities regulation. Securities regulation has done a good deal for the knowledgable investors, principally by increasing the quantity and improving the quality of the information available to them. But one of its primary concerns has always been the welfare of the unsophisticated investor, who is often the one most likely but least able to bear the burden of high charges in a competitive market. If it is desirable for millions of unsophisticated investors of modest means to invest in securities through the medium of mutual funds, it is also desirable that they should not subsequently have cause to believe that they were unfairly dealt with. On balance, we concluded therefore that a modification of the manner in which sales charges on mutual fund shares are now regulated was more consonant with the spirit and purpose of the securities laws than the elimination of Section 22(d). We therefore recommended that sales charges be limited to 5% of the amount invested, with authority in the Commission to raise this limit in appropriate situations.[39]
It is significant to note, that in the same hearings, some participants recognized that brokerage transactions, necessarily executed in the secondary market, were within the prohibition of § 22(d).
*107 Senator Proxmire, for example, asked whether or not the SEC would recommend the repeal of 22(d) "in order to permit price competition in the sale of the same mutual fund by various broker-dealers."[40] Senator Mondale stated that section "22(d) permitsindeed makes it illegal for agents to sell at a sales charge less than that prescribed by the company,[41] while Professor Paul Samuelson, Massachusetts Institute of Technology, testified that "Congress should repeal the provision in section 22(d) of the Investment Company Act of 1940 which prohibits a broker from selling mutual fund shares to the public at less than the public offering price."[42] Later in the hearings, Senator Mondale again remarked that "Section 22(d) makes it illegal for an agent to charge less than his company says he must charge as an agent's fee, but it does not prohibit or have anything to do with competition as between companies."[43]
Similar statements appear in the House Hearings, including the following exchange between Congressman Watkins and then-SEC Chairman Cohen:[44]
Mr. Cohen. The statute now, and since 1940, interferes with competitive business in this area.
Mr. Watkins. Not to the extent you are proposing.
Mr. Cohen. I am sorry, sir. The statute is unequivocal. No person, no matter where he got it, from the issuer, from another dealer, or even from a private person, no broker-dealer may sell a share of a particular fund at a price less than that fixed by the issuer.
Mr. Watkins. True.
In the same House Hearings, the Department of Justice, while urging the repeal of 22(d), characterized its provisions as follows:
It is true that Congress, in originally enacting the "fixed price" provisions of Section 22(d) in 1940, provided for the mutual fund industry an exception to the basic competitive requirements of the antitrust laws. In view of changed conditions, however, and the fact that the mutual funds are so important an outlet for the small investor, it would seem that he should not perhaps be deprived of the opportunity of purchasing his investment at a price arrived at through the free operation of competitive forces.[45]
The SEC took the same view. The then-Chairman Cohen stated that "sellers of mutual fund securities have been insulated by Federal Law from price competition at the retail level ever since 1940" (1967 Senate Hearings 26), and that § 22(d) "provides an exemption from the antitrust laws" (1967 House Hearings 1940). Furthermore, the SEC's view that § 22(d) requires retail price maintenance by broker-dealers who are members of the primary distribution system is also evident in its acceptance of NASD Rule 26(e), which provides that "no member shall offer or sell any such security except at the effective public offering price described in the current prospectus of the issuing company . . . ." CCH NASD Manual ¶ 2176.
The same thread runs through hearings conducted in 1969,[46] again with a *108 view to the modification or repeal of § 22(d). In the 1969 Senate report, we find these comments on § 22(d):
The provision for "reasonable loads to investors" is intended to assure that the sales loads fixed by the principal underwriters (which continue to be protected against price competition by Section 22(d) of the act) will be established at levels which recognize the interests of investors.
The provisions of this proposed section shall prevail over any conflicting provision of Federal law. This provision, which is identical to Section 15A(n) of the Securities Exchange Act, is designed to make it clear that no other provision of Federal law, including the antitrust laws, prevents a registered securities association from adopting rules consistent with, and necessary to effectuate, the purposes and provisions of this section. S. Rep.No.184, 91st Cong., 1st Sess. 18 (1969) (emphasis added).
The basic sales commission charged for mutual fund shares is in most instances about 8½ percent of the total payment or 9.3 percent of the amount invested. This charge is protected by Section 22(d) of the Investment Company Act which provides for a unique scheme of retail price maintenance. Under this section, all dealers, regardless of the source of the shares they sell, are prohibited by law from cutting the sales charge fixed by the mutual fund underwriter. Price cutting in this field is a Federal crime.

In its deliberations your committee considered the possibility of deleting Section 22(d) from the act. However, impressive testimony was given that there had not been sufficient study of the consequences of such an amendment. Therefore, your committee requests the Securities and Exchange Commission to review the consequences of such a proposal on both the investing public and mutual fund sales organizations and report to it as soon as is reasonably practicable. Id. 7-8 (emphasis added).
It is thus conclusively established that competition in the sale of a single fund's shares is effectively precluded by the 1940 Act which was intended, via § 22(d), to prevent the sale of fund shares at a price less than that fixed in the current prospectus. It is obvious that Section 22(d) of the 1940 Act was premised upon a congressional understanding that principal underwriters and broker-dealers were exempt from the antitrust laws when entering into uniform sales agreements for mutual fund shares. It is also obvious that even at the expense of a secondary market Congress intended to maintain the resale price maintenance system. Congressional intent is entitled to substantial weight lest this Court "change the design that Congress fashioned." State Board of Insurance v. Todd Shipyards Corp., 370 U.S. 451, 458, 82 S.Ct. 1380, 1385, 8 L. Ed.2d 620 (1962).

B. Section 22(f)

Section 22(f) is a necessary companion to § 22(d). If the problems of the competitive market created by noncontract brokers were to be met, restrictions on alienability were necessary. And Section 22(f) provides:
No registered open-end company shall restrict the transferability or negotiability of any security of which it is the issuer except in conformity with the statements with respect thereto contained in its registration statement nor in contravention of such rules and regulations as the Commission may prescribe in the interests of the holders of all of the outstanding securities of such investment company.
Paraphrased, that language states clearly that if (1) restrictions on transferability or negotiability are included in the registration statement, and if (2) these restrictions are not in contravention of such rules and regulations as the commission may prescribe in the interest *109 of the shareholders, then such restrictions are permissible even if they create departures from antitrust standards.
As noted above in the discussion of § 22(d), Congress considered the 1940 Act in the light of then-existing conditions, particularly the disruptive influence upon the market in mutual fund shares by the practices of non-contract dealers and brokers.
To overcome this disruptive competition prior to the enactment of the 1940 Act, some funds restricted the alienability of their shares, "providing substantially that the shares could only be sold or tendered for redemption to the openend investment company."[47] Such restrictions were usually included in the share certificates.[48]
From and after 1940, § 22(f) required that any restriction on alienability be included in the registration statements and, additionally, that they be subject to the rule-making authority of the SEC. Clearly, by § 22(f) Congress specifically empowered mutual funds to restrict the tranferability and negotiability of their shares, subject, of course, to disclosure in registration statements and to the rule-making authority of the SEC. Just as clearly Congress sanctioned such restrictions with full knowledge of their effect upon a secondary market which existed at the time and in full recognition of the antitrust implications.
Restrictions on alienability have consistently appeared in registration statements and in uniform sales agreements since the passage of the 1940 Act. Not only are such contracts required by SEC-approved Rule 26 of the NASD Rules of Fair Practice, CCH NASD Manual ¶ 2176, but they are also disclosed in the registration statements. It is undisputed that these agreements have remained virtually unchanged since they were first filed with the SEC along with and as part of the registration statements. It is also undisputed that the SEC has never challenged the validity of uniform sales agreements. Indeed, the SEC has noted that these agreements require a dealer "to place all orders with the principal underwriter and to refrain from any attempt to obtain shares from other sources."[49]
It is thus apparent that Congress designed §§ 22(d) and 22(f) to create and protect a primary distribution system which is repugnant to the antitrust laws and did so in complete recognition of the fact that the legislation would frustrate the growth of a free secondary market. That statutory scheme is "incompatible with the maintenance of (an) antitrust action." Silver v. New York Stock Exchange, 373 U.S. 341, 358, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).
Whether the mutual fund marketing structure mandated by Congress in 1940 should be eliminated or modified is an issue for Congress and the SEC, not the Judicial Branch, to hear and to decide. In fact, in urging its complaint upon the Court, one of the plaintiffs, viz., the Department of Justice, seeks to accomplish indirectly what it has failed, so far, to achieve directlythe repeal or modification of § 22(d)in hearings before both Congress[50] and the SEC.[51]

V

IMPLIED IMMUNITY
Even if a specific exemption granted by the Maloney Act were *110 deemed to be inadequate to grant immunity from the impact of the antitrust laws, the defendants urge that the 1940 Act, particularly § 22 thereof, created a pervasive regulatory scheme which highlighted the Congressional intent to immunize the investment company industry from the impact of the antitrust laws.
The plaintiffs, on the other hand, urge that repeals of the antitrust laws by implication are "strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." They argue that, in the instant case, plain repugnancy is not apparent.
The most recent pronouncement of the Supreme Court on this particular point is to be found in Hughes Tool Company v. Trans World Airlines, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).
In Hughes Tool the respondent TWA challenged as violative of the antitrust laws certain transactions and activities of petitioner Hughes Tool (Hughes). The Supreme Court, dismissing the action, held that the challenged transactions "were under the control and surveillance of the Civil Aeronautics Board" (CAB); that pursuant to the Federal Aviation Act of 1968 the CAB applying antitrust standards has reviewed the same kind of conduct which TWA alleged to be violative of the antitrust laws. The Court stated:
In this context, the authority of the Board to grant the power to "control" and to investigate and alter the manner in which that "control" is exercised leads us to conclude that this phase of CAB jurisdiction . . . pre-empts the antitrust field. 409 U. S. at 385, 93 S.Ct. at 660 (footnote omitted).
And the Court further stated that where
the CAB authorizes control of an air carrier to be acquired by another person or corporation and where the CAB specifically authorizes as in the public interest specific transactions between the parent and the subsidiary, the way in which that control is exercised in those precise situations is under the surveillance of CAB, not in the hands of those who can invoke the sanctions of the antitrust laws. 409 U.S. at 387, 93 S.Ct. at 661.
Further the Court said that its holding was "consistent with the view expressed in Silver v. New York Stock Exchange . . . that a statutory scheme that does not create a total exception from antitrust laws may, nonetheless, in particular and discrete instances by implication grant immunity from an antitrust claim." 409 U.S. at 385 n.14, 93 S.Ct. at 660 (emphasis added).
The Court in Hughes Tool relied heavily on its prior decision in Pan American World Airways v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), which also involved the pervasive regulatory scheme of the CAB and an implied repeal of the antitrust laws. In Pan American the Court found that the Sherman Act could not be applied to matters which the CAB had approved in exercising its statutory function.
It would be strange, indeed, if a division of territories or an allocation of routes which met the requirements of "public interests" as defined in § 2 were held to be antitrust violations . . . . If the courts were to intrude independently with their construction of the antitrust laws, two regimes might collide. 371 U.S. at 309-10, 83 S.Ct. at 484.
The Court then found that the implementation of antitrust policy in the public interest was for the CAB, under the Federal Aviation Act's comprehensive regulatory scheme, and not for the courts. In the case at bar, as in Hughes Tool and Pan American, there exists a pervasive regulatory scheme coupled with a legislative history manifesting congressional intent to immunize the investment company industry from the operation of the antitrust laws to the limited extent necessary to carry out the purpose of the independently defined federal policy legislated in the regulatory *111 act, i. e., the Investment Company and Maloney Acts.[52]
The decisions in Hughes Tool and Pan American are consistent with the views expressed in Silver v. New York Stock Exchange, supra, where the Supreme Court held that the Stock Exchange was not exempt from the antitrust laws when, pursuant to its rules, it ordered its members to remove certain telephone connections they had with the offices of a non-member. Although the Exchange was generally regulated by the Securities Exchange Act of 1934, the Court noted that the SEC lacked jurisdiction to review cases such as petitioner's where the Exchange has enforced its rules. Silver v. New York Stock Exchange, supra, 373 U.S. at 358, 83 S.Ct. 1246.
The Court's opinion in Silver turned on the fact that there was no justification for the Exchange rule under the Securities Exchange Act because that rule did not provide any procedural safeguards for the petitioner. The Court did find, however that "particular instances of exchange self-regulation which fall within the scope and purposes of the Securities Exchange Act may be regarded as justified in answer to the assertion of an antitrust claim." 373 U.S. at 361, 83 S.Ct. at 1259. The Court noted further that "(s)hould review of exchange self-regulation be provided through a vehicle other than the antitrust laws, a different case as to anti-trust exemption would be presented. See note 12, supra." 373 U.S. at 360, 83 S.Ct. at 1258. The Court's reference, "note 12," refers expressly to the SEC's jurisdiction under the Maloney Act and states that were there such SEC jurisdiction in a Silver-type situation, "a different case would arise concerning exemption from the operation of laws designed to prevent anti-competitive activity . . ." 373 U.S. at 358 n.12, 83 S.Ct. at 1257.[53]
This Court is persuaded that the instant case is that "different case."[54] The Investment Company Act and the Maloney Act read together demonstrate that Congress intended to eliminate free competition in the distribution of mutual fund shares. The language of both acts clearly defines the pervasive statutory and administrative control over the area and manifests a congressional intent to leave this complex field to the supervision and control of an expert administrative *112 agency.[55] The SEC and the NASD have the statutory authority to control the area and both have in fact taken an active role. The NASD, under the control and supervision of the SEC, has adopted specific rules to govern the activities of principal underwriters and broker-dealers. The Maloney Act, Section 15A(b) (8), specifically requires the SEC to employ antitrust standards, i. e., "to protect the public interest," when reviewing the rules promulgated by the NASD.[56] Still further, the SEC has adopted rules specifically designed to govern non-NASD members in the distribution and redemption of mutual fund shares. See 15 U.S.C. § 78o(b)(8)-(10). In connection with its regulatory function, the SEC has extensively reviewed the distribution and redemption practices in the investment company securities industry and even has reviewed the secondary market for such securities.[57]
This Court's opinion is further strengthened by the Supreme Court's decision last Term in United States v. Cartwright, 411 U.S. 546, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973). That case challenged a regulation issued by the Secretary of the Treasury covering valuation of mutual fund shares for Federal Estate Tax purposes. The Court at least impliedly recognized the pervasive regulatory scheme in the investment company industry.
Private trading in mutual fund shares is virtually non-existent. Thus at any given time, under the statutory scheme created by the Investment Company Act, shares of any open-end mutual fund with a sales load are being sold at two distinct prices. Initial purchases by the public are made from the fund, at the "asked" price, which includes the load. But shareholders "sell" their shares back to the fund at the statutorily defined redemption or bid price. 411 U.S. at 549, 93 S.Ct. at 1715 (emphasis added).
The Court went on to state that the regulation in question was "manifestly inconsistent with the most elementary provisions of the Investment Company Act of 1940 and operates without regard for the market in mutual fund shares that the Act created and regulates." 411 U.S. at 557, 93 S.Ct. at 1719 (emphasis added).
The plaintiffs place great reliance on other recent Supreme Court decisions. Principally they rely upon Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), in which the Court refused to imply immunity from the antitrust laws. Plaintiffs cite Otter Tail to show that even extensive regulation of an industry does not thereby immunize that industry from the antitrust laws. The Court's language is clear and unequivocal, however, *113 for it found congressional intent not to displace the antitrust laws, but rather to retain the applicability in order to promote competition. That is not the case here.
It is clear, then, that Congress rejected a pervasive regulatory scheme for controlling the interstate distribution of power in favor of voluntary commercial relationships. When these relationships are governed in the first instance by business judgment and regulatory coercion, courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws. See United States v. Radio Corporation of America, supra, 358 U.S. 334, at 351, 79 S.Ct. 457, 3 L. Ed.2d 354. This is particularly true in this instance because Congress, in passing the Public Utility Holding Company Act, . . . was concerned with "restraint of free and independent competition" among public utility holding companies. See 15 U.S.C. § 79a(b)(2). 410 U.S. at 374, 93 S.Ct. at 1028 (emphasis added).
Otter Tail accordingly is not controlling.
Nor does Federal Maritime Commission v. Seatrain Lines, Inc., 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973), support plaintiffs' position. That case dealt with the scope of an express repealer of the antitrust laws in the 1916 Shipping Act[58] which by its terms, limited antitrust immunity to conference agreements approved by the Federal Maritime Commission (FMC). At issue was whether an agreement which confers no ongoing obligations is an "agreement" within the meaning of the Act. The Court held that Congress did not intend to invest the FMC with the power to shield from antitrust liability mergers which create no continuing responsibilities. Furthermore, the Court found in examining the legislative history there was an overriding federal policy to promote competition. Since the FMC's power to immunize agreements from the antitrust laws was limited only to those agreements approved by it, this Court fails to see in what manner the claim for limited immunity in the present case offends the Seatrain principle since there is no similar requirement conditioning exemptions in the 1940 Act.[59]
This Court is not, of course, unmindful of the fact that "(r)epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." United States v. Philadelphia National Bank, 374 U.S. 321, 350-351, 83 S.Ct. 1715, 1734, 10 L.Ed.2d 915 (1963) (footnotes omitted). See also United States v. McKesson & Robbins, Inc., 351 U.S. 305, 316, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); California v. FPC, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939). That principle, of course, rests upon the sound basis that "antitrust laws represent a fundamental national economic policy." Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 218, 86 *114 S.Ct. 781, 784, 15 L.Ed.2d 709 (1966).[60] With that fundamental policy in mind, the Court does not hold that the Investment Company Act and the Maloney Act "completely displace the antitrust laws." Hughes Tool, supra, 409 U.S. at 389, 93 S.Ct. 647. What the Court does find is a "limited antitrust exemption." Carnation Co., supra, 383 U.S. at 219, 86 S.Ct. 781. Here, given the fact that Congress clearly intended to substitute a pervasive regulatory scheme, i. e., § 22 of the 1940 Act, for the usual antitrust prohibitions in the narrow area of distribution and sale of mutual fund shares, it is clear that the price maintenance practices complained of are immune from ordinary antitrust strictures.[61]

VI

CONCLUSION
In light of the foregoing, the Court concludes that the plaintiffs in each of the above-captioned cases have failed to state a claim upon which relief can be granted, and that accordingly the motions to dismiss in each such case must be granted. Orders are filed herewith.

ORDERS IN NOS. 2454-72, 338-73, 426-73.
This matter having come on for ruling on the defendants' motions pursuant to Rule 12 of the Federal Rules of Civil Procedure to dismiss the complaint for failure to state a claim upon which relief can be granted, the parties having filed briefs in support of their respective positions, and the Court being fully advised in the premises and having issued its Memorandum Opinion on December 14th, 1973;
It is this 14th day of December, 1973,
Ordered that the above-captioned case be, and the same is, hereby dismissed on the merits and with prejudice for failure to state a claim upon which relief can be granted.

ORDER IN NO. MISC. 103-73.
Upon the Court's own motion, it is this 14th day of December, 1973,
Ordered that all further proceedings relating to (1) answers or motions with respect to the complaints, (2) class certification, and (3) discovery, by any party in any case in the above-captioned action heretofore or hereafter filed in this Court are stayed pending further order of this Court following disposition of any appeal from the Orders entered by this Court on December 14, 1973, in Haddad v. The Crosby Corp., et al., Civil Action No. 2454-72; United States v. National Association of Securities Dealers, Inc., Civil Action No. 338-73; and Gross, et al. v. National Association of Securities Dealers, Inc., et al., Civil Action No. 426-73.
So ordered:
NOTES
[*] The other defendants include: Institutional Equity Corp., Piedmont Capital Corp., Vance, Sanders & Co., Inc., Wellington Management Co., American Funds Distributors, Inc., Fidelity Management & Research Co., Summit Management & Research Corp., Lexington Management Corp., National Association of Securities Dealers, Inc., Investment Co., Institute, Edward C. Johnson, 2d, Edward C. Johnson, 3d, Loring, Sullivan, Byrnes, Burgin, Cornell, McEwan, Hood, McKenzie, Schermerhorn, Merrill Lynch, Pierce, Fenner & Smith, Inc., Reynolds Securities, Inc., Bache & Co., Inc., W. E. Hutton & Co., Thomson & McKinnon Auchincloss, Inc., duPont Glore Forgan, Inc., Walston & Co., Inc., Hayden Stone, Inc., Blythe, Eastman Dillon & Co., Inc., Dean Witter & Co., Inc., Hornblower & Weeks-Hemphill Noyes, Inc., E. F. Hutton & Co., Inc., Paine Webber Jackson & Curtis, Inc.
[**] The other defendants include: Massachusetts Investors Growth Stock Fund, Inc., Fidelity Fund, Inc., Wellington Fund, Inc., The Crosby Corp., Vance, Sanders & Co., Inc., The Wellington Management Co., Inc., Merrill Lynch, Pierce Fenner & Smith, Inc., Bache & Co., Inc., Reynolds Securities Corp., F. I. duPont, Glore Forgan, Inc., E. F. Hutton, Inc., Walston & Co., Inc., Dean Witter & Co., Inc., Paine, Webber, Jackson & Curtis, Inc., Hornblower & Weeks-Hemphill, Noyes, Inc.
[***] The other defendants include: Massachusetts Investors Growth Stock Fund, Inc., Fidelity Fund, Inc., Wellington Fund, Inc., The Crosby Corp., Vance, Sanders & Co., Inc., The Wellington Management Co., Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Bache & Co., Inc., Reynolds Securities Corp., F. I. duPont, Glore Forgan, Inc., E. F. Hutton, Inc., Walston & Co., Inc., Dean Witter & Co., Inc., Paine, Webber, Jackson & Curtis, Inc., Hornblower & Weeks-Hemphill, Noyes, Inc.
[1] By definition an open-end management investment company is any issuer which (1) "is or holds itself out as being primarily . . . in the business of investing, reinvesting, or trading in securities" (15 U. S.C. § 80a-3); (2) is not a face-amount certificate company or a unit investment trust (15 U.S.C. § 80a-4); and (3) is "offering for sale or has outstanding any redeemable security of which it is the issuer" (15 U.S.C. § 80a-5).
[2] 15 U.S.C. § 80a-1 et seq. (1970).
[3] The NASD, incorporated in Delaware on July 18, 1939, became registered under the Maloney Act, § 15A of the Securities Exchange Act of 1934, 15 U.S.C. § 78o-3, on August 7, 1939. National Association of Securities Dealers, Inc., 5 S.E.C. 627 (1939). It is the only association ever to have applied for or been granted registration under the Maloney Act. Its membership is comprised of some 4400 broker-dealers and principal underwriters.
[4] Since the filing of the above-captioned actions, some fifty private suits, purporting to be class actions under Fed.R.Civ.P. 23, have been filed in various United States District Courts around the country. These cases have been transferred to this district by the Judicial Panel on Multidistrict Litigation, and are collectively cited as: In Re Mutual Fund Sales Antitrust Litigation, Civil Action No. Misc. 103-73. Pre-trial discovery and other activity in all cases (including the instant cases) has been stayed pending disposition of the motions to dismiss under consideration here.

The Court has also reserved judgment in all alleged class suits on the question of whether the actions may be maintained as class actions under Fed.R.Civ.P. 23.
[5] A principal underwriter is defined by the 1940 Act as

any underwriter who as principal purchases from (an open-end investment) company, or pursuant to contract has the right . . . from time to time to purchase from such company, any such security for distribution, or who as agent for such company sells or has the right to sell any such security to a dealer or to the public or both, but does not include a dealer who purchases from such company through a principal underwriter acting as agent for such company. 15 U.S.C. § 80a-2(a)(29).
[6] A broker is defined by the 1940 Act as "any person engaged in the business of effecting transactions in securities for the account of others, but does not include a bank or any person solely by reason of the fact that such person is an underwriter for one or more investment companies." 15 U.S.C. § 80a-2(a)(6). A dealer is defined as "any person regularly engaged in the business of buying and selling securities for his own account, through a broker or otherwise, but does not include a bank, insurance company, or investment company, or any person insofar as he is engaged in investing, reinvesting, or trading in securities, or in owning or holding securities, for his own account, either individually or in some fiduciary capacity, but not as a part of a regular business." 15 U.S.C. § 80a-2(a)(11).
[7] The identities of all the parties in each of the above-captioned cases are reflected in the accompanying Orders.
[8] In opposition to the motions to dismiss all the plaintiffs also rely on the proposition that a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that plaintiffs are unable to prove any set of facts which would entitle them to relief. Neither the defendants nor this Court have any argument with that general proposition, but, as the issues are drawn here for purposes of these motions to dismiss, they are strictly legal ones as to which the facts as alleged in the complaints or otherwise are not relevant.
[9] Report of the SEC, Investment Trusts and Investment Companies, Part Three, Abuses and Deficiencies in the Organization and Operation of Investment Companies, H.R.Doc. No.279, 76th Cong., 1st Sess. (1939) (hereinafter cited as Investment Trust Study of 1940).
[10] Hearings on S. 3580 Before a Subcomm. of Senate Comm. on Banking and Currency, 76th Cong., 3d Sess. (1940) (hereinafter cited as 1940 Senate Hearings).
[11] That Act included § 22(d), one of the sections in controversy in this case, discussed infra. Section 22(d) prohibited sales of investment company shares to the public at any price other than the fixed public offering price.
[12] The Act delimits permissible methods for selecting directors of investment companies (and trustees in the case of investment trusts) (§ 16), sets out qualifications for securities custodians [§ 17(i)] and methods of safekeeping securities [§ 17(g)], and prohibits indemnification for official conduct [§§ 17(h) and (i)]. Certain persons guilty of prior malfeasance are barred altogether from affiliating with investment companies, advisers, custodians, and principal underwriters (§ 9). Others who commit misconduct or abuse their positions of trust can be enjoined (§ 36). Misappropriation of company funds is made a federal crime (§ 37).

The Act also sets out minimum capitalization requirements for the companies (§§ 14 and 18). It requires a majority shareholder vote for changes in a company's open-end or closed-end nature, its diversification, its capacity to borrow money, issue senior securities, underwrite others' securities, purchase and sell real estate and commodities, or make loans, its investment policies, and its fundamental business (§ 13). Certain dividend distributions are barred unless timely disclosed to the shareholders (§ 19). Investment companies are barred from participating in certain types of securities transactions [§ 12(a)] and from making certain loans (§ 21). Some proxy solicitations are barred [§ 20(a)] and some exchanges need prior SEC approval (§ 11). Reorganization plans must be submitted to the SEC, which can render a negative advisory report and seek an injunction with respect to such reorganizations (§ 25). Voting trusts and cross or circular ownership patterns are barred (§ 35). Accountants must meet certain criteria, be selected in a particular fashion, and perform certain functions (§ 32). The regulated companies must keep and refrain from destroying certain books and records (§§ 31 and 34). Unit investment trusts (§ 26) and face amount certificate companies (§§ 28-30) are given special regulatory treatment.
The Act curtails the pyramiding of mutual funds [§§ 12(d)-(g)]. Unless it is itself the principal underwriter, no investment company may acquire shares of another company whose principal underwriter is related to the first company [§ 10(f)]. At least 40% of the company's board must consist of independent directors (§ 10). Advisory contracts must first be approved by a majority of directors unaffiliated with the adviser or by a majority of shareholders [§ 15(c)]. Investment company transactions conducted by or with affiliated persons are prohibited in some cases and narrowly circumscribed in others (§ 17).
[13] § 15A(b)(8), 15 U.S.C. § 78o-3(b)(8).
[14] Before 1970, then-Section 22(b) authorized the NASD to issue rules barring "unconscionable" and "grossly excessive" sales loads, and then-Section 22(c) empowered the SEC to issue superseding rules for both NASD members and non-members.
[15] § 15A(b)(8), 15 U.S.C. § 78o-3(b)(8).
[16] The SEC may also grant qualified exemptions from NASD rules for "smaller companies" [§ 22(b)(1)]. Section 22(b)(2), another 1970 addition, gives the SEC the same rate-fixing powers over non-NASD broker-dealers as Section 22(b)(1) gives the NASD over its members. An underwriter whose shares are distributed by non-members of NASD, however, may elect to have its shares sold under the NASD rather than the SEC sales load rule. [§ 22(b)(2)].
[17] The 1940 Act contains other provisions with respect to distribution. Redemption privileges may not be suspended or postponed for more than seven days after tender except during certain exceptional circumstances as defined by the SEC [§ 22(e)]. A fund may not issue shares for services or property other than cash or securities except as a dividend or shareholder distribution or in a reorganization [§ 22(g)]. Thus watering of shares is prevented.

Investment companies issuing periodic payment plan certificates may charge no more than a 9% sales load, nor deduct more than 50% of that load from the first year's payments, nor deduct disproportionate amounts, nor allow periodic payments of less than certain small amounts, nor make proceeds subject to management or other fees which exceed the amount the Commission prescribes as reasonable (§ 27). 1970 amendments added refund requirements and empowered the SEC to make rules with respect to reserves. (Id.)
Close-end funds are specially regulated with respect to watering and repurchase prices (§ 23).
[18] Baum v. Investors Diversified Services, 286 F.Supp. 914, 921 (N.D.Ill.1968), aff'd, 409 F.2d 872 (7th Cir. 1969).
[19] Rule 22c-1, 17 C.F.R. § 270.22c-1, adopted in Investment Co. Act Release No. 5519 (1969), CCH Fed.Sec.L.Rep. '67-'69 Decisions ¶ 77,616.
[20] Rule 22d-1, 17 C.F.R. § 270.22d-1, adopted in Investment Co. Act Release No. 2798 (1958).
[21] Investment Co. Act Release No. 5507 (1968), in CCH Fed.Sec.L.Rep. '67-'69 Decisions ¶ 77,609; Investment Co. Act Release No. 6069 (1970) in CCH Fed.Sec.L.Rep. '69-'70 Decisions ¶ 77,826 and Investment Co. Act Release No. 7571 (1972) in CCH Fed.Sec.L.Rep. '72-'73 Decisions ¶ 79,148.
[22] Investment Co. Act Release No. 6347 (1971), in CCH Fed.Sec.L.Rep. '70-'71 Decisions ¶ 77,953.
[23] Rule 22d-2, proposed in Investment Co. Act Release No. 7555 (1972), CCH Fed.Sec. L.Rep. '72-'73 Decisions ¶ 79,132.
[24] See the list of more than 100 such applications in 4 CCH Fed.Sec.L.Rep. at p. 68,751 et seq. The Commission staff has issued an abundance of letters in response to "no action" requests with respect to these rules and the basic statutory provisions. From 1971 through March 21, 1973, there were 49 such letters listed in 4 CCH Fed. Sec.L.Rep. at pp. 63,134; 63,789; and 63,894.
[25] See, e. g., Spiro Sideris, Exchange Act Release No. 8816 (1970) (underpricing); Russell L. Irish, Exchange Act Release No. 7687 (1965), CCH Fed.Sec.L.Rep. '64-'66 Decisions ¶ 77,274 (overpricing). The commission has also sought to regulate excessive "indirect" compensation to fund dealers. E. g., SEC approval of new NASD Rules of Fair Practice, Section 26(k), which bars members from selling certain investment companies' shares in such a way that the companies will reciprocate with portfolio brokerage commissions, and conversely, Exchange Act Release No. 10147 (May 14, 1973), 5 Fed.Sec.L.Rep. ¶ 79,372.
[26] Proposed Amendment to the Rules of Fair Practice of National Ass'n of Securities Dealers, Inc., 9 SEC 38 (1941).
[27] NASD Rules of Fair Practice, Article III, Section 26 in CCH NASD Manual ¶ 2176.
[28] See note 25 supra.
[29] See Part IV infra.
[30] See note 47 infra and accompanying text.
[31] See, e. g., Mutual Funds Advisory, Inc., Investment Co. Act Release No. 6932 (Jan. 12, 1972); First Multifund of America, Inc., Investment Co. Act Release No. 6700 (1971), CCH Fed.Sec.L.Rep. '70-'71 Decisions ¶ 78,209 at p. 80,602; Russell L. Irish, Exchange Act Release No. 7687 (1965), CCH Fed.Sec.L.Rep. '64-'66 Decisions ¶ 77,274 at 82,431 n. 13.
[32] See generally Investment Trust Study of 1940; Report of the Securities and Exchange Commission on the Public Policy Implications of Investment Company Growth, H.R.Rep.No.2337, 89th Cong., 2d Sess. (1966) (hereinafter cited as Public Policy Report).
[33] Public Policy Report 218-19. See Report of the Staff of the Securities and Exchange Commission on the Potential Impact of a Repeal of Section 22(d) of the Investment Company Act of 1940, pt. I, at 1 (November 10, 1972) [hereinafter cited as SEC Staff Report on Repeal of § 22(d)], CCH Fed. Sec.L.Rep.No.450 (Nov. 15, 1972) pt. II, at A-1.
[34] See also the exemption from the antitrust laws provided by § 22(b) (4):

If any provision of this subsection is in conflict with any provision of any law of the United States in effect on December 14, 1970, the provisions of this subsection shall prevail. 15 U.S.C. § 80a-22(b)(4).
[35] Hearings on S.3580 Before a Subcomm. of the Senate Comm. on Banking and Currency, 76th Cong., 3d Sess. (1940); Hearings on H.R.10065 Before a Subcomm. of the House Comm. on Interstate and Foreign Commerce, 76th Cong., 3d Sess. (1940); S. Rep.No.1775, 76th Cong., 3d Sess. (1940); H.R.Rep.No.2639, 76th Cong., 3d Sess. (1940); Hearings on S.1659 Before the Senate Comm. on Banking and Currency, 90th Cong., 1st Sess. (1967); Hearings on H.R. 9510 and H.R.9511 Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce, 90th Cong., 1st Sess. (1967); S.Rep.No.1351, 90th Cong., 2d Sess. (1968); Hearings on S. 34 and S.296 Before the Senate Comm. on Banking and Currency, 91st Cong., 1st Sess. (1969); Hearings on H.R.11995, S.2224, H. R.13754 and H.R.14737 Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce, 91st Cong., 1st Sess. (1969); S. Rep.No.184, 91st Cong., 2d Sess. (1969); H.R.Rep.No.1382, 91st Cong., 2d Sess. (1970); H.R.Rep.No.1631, 91st Cong., 2d Sess. (1970).
[36] Investment Trust Study of 1940, 865; see also Hearings on H.R.9510 and 9511 Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce, 90th Cong., 1st Sess. 59 (1967) (hereinafter cited as 1967 House Hearings).
[37] Investment Trust Study of 1940, 864; Public Policy Report 219.
[38] 1940 Senate Hearings 1057.
[39] Hearings on S.1659 Before the Senate Comm. on Banking and Currency, 90th Cong., 1st Sess. 154-55 (1967) (hereinafter cited as 1967 Senate Hearings).
[40] Id. 51-52.
[41] Id. 275 (emphasis added).
[42] Id. 348 (emphasis added).
[43] Id. 769 (emphasis added).
[44] 1967 House Hearings 711.
[45] Id. 21 (letter from Warren Christopher, Deputy Attorney General, to Chairman Harley O. Staggers, October 18, 1967).
[46] Hearings on S.34 and S.296 Before the Senate Comm. on Banking and Currency, 91st Cong., 1st Sess. (1969); Hearings on H.R.11995, S.2224, H.R.13754 and H.R.14737 Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce, 91st Cong., 1st Sess. (1969).
[47] Investment Trust Study of 1940, 865.
[48] 1940 Senate Hearings, 292 (remarks of SEC General Counsel David Schenker).
[49] SEC Staff Report on Repeal of § 22(d) A-109. See Report of the Special Study of Securities Markets of the Securities and Exchange Commission, H.R.Doc.No.95, 88th Cong., 1st Sess. 98 (1963), wherein reference is made to the "fair trade arrangements established by the Act, the NASD rules and private sales agreements . . ."; Greene, Uniform Offering Price, supra, 37 U.Det.L.J. at 371-72.
[50] 1967 House Hearings.
[51] In the Matter of Mutual Fund Distribution and the Potential Impact of a Repeal of Section 22(d) of the Investment Company Act of 1940, SEC File No. 4-164 (1973).
[52] In Hecht v. Pro-Football, Inc., 144 U.S. App.D.C. 56, 444 F.2d 931 (1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), the Court held the following to be relevant criteria for determining which conduct is immune from the antitrust laws:

Putting the problem in this light, relevant criteria would include the specific language of the congressional statute involved, any legislative history which would throw light on the congressional intent, the relative importance of the governmental action which is asserted to override antitrust policy, whether the governmental agency is required to take into consideration the possible anticompetitive effect of its actions, whether the agency is required to adhere to a clearly defined and restricted statutory directive, and to what extent the agency's actions are subject to judicial review. 144 U.S.App.D.C. at 60, 444 F.2d at 935.
See also Thill Securities Corp. v. New York Stock Exchange, 433 F.2d 264, 270 (7th Cir. 1970), cert. denied, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971), where the Court also discussed immunity criteria; United States v. Morgan, 118 F.Supp. 621 (S.D.N.Y.1953).
[53] But see Harwell v. Growth Programs, Inc., 451 F.2d 240 (5th Cir. 1971), reh. denied, 459 F.2d 461, cert. denied, 409 U.S. 876, 93 S.Ct. 126, 34 L.Ed.2d 129 (1972), where the Court applied the Silver rationale to self-regulatory activities of the NASD. Harwell, however, did not involve a claim of limited antitrust immunity under § 22 of the 1940 Act.
[54] Cf. Gordon v. New York Stock Exchange, Inc., et al., 366 F.Supp. 1261 (S.D. N.Y.1973), where the Court, in dismissing an antitrust attack on the commission structure of both the New York and American Stock Exchanges, found that the fixing of commissions falls within the congressional policy of exchange self-regulation embodied in the Securities Exchange Act of 1934.
[55] In Baum v. Investors Diversified Services, Inc., 286 F.Supp. 914 (N.D.Ill.1968), aff'd on other grounds, 409 F.2d 872 (7th Cir. 1969), the plaintiff alleged a violation of the Robinson-Patman Act. After reviewing the SEC involvement, the court held:

The foregoing demonstrates that the SEC has exercised its broad regulatory authority in this industry to establish a framework of pricing practices within which investment companies must operate. It has specifically approved the alleged discriminatory pricing system under attack in the case at hand, and has justified the system as being "in the public interest and consistent with the protection of investors and purposes fairly intended by the policy and provisions of this Title." 286 F.Supp. at 924.
[56] See also Section 6(c) of the 1940 Act which empowers the SEC to "exempt any person, security, or transaction . . . from any provision" of the Act "if and to the extent that such exemption is necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by the policy and provisions" of the Act. 15 U.S.C. § 80a-6(c) (emphasis added).
[57] See, e. g., Public Policy Report; SEC Staff Report on Repeal of § 22(d); In the Matter of Mutual Fund Distribution and the Potential Impact of a Repeal of Section 22(d) of the Investment Company Act of 1940, SEC File No. 4-164 (1973).
[58] 46 U.S.C. § 814. See Note, The Shipping Industry Seeks a Safe Haven: Merger Jurisdiction for the FMC?, 5 Law & Pol. Int'l Bus. 274 (1973).
[59] Cf. Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 302-303 n. 13, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973), where the Court recognized that where a regulatory act contains an express exemption from the operation of the antitrust laws, or where a regulatory agency is specifically directed to consider competitive factors in the exercise of its duties, it is necessary to conclude that Congress intended to exempt from the antitrust laws activity subject to the administrative agency's adjudicative or rule-making authority.

Moreover, the cases at bar do not involve the doctrine of primary jurisdiction. See, e. g., Chicago Mercantile Exchange v. Deaktor, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973); Ricci v. Chicago Mercantile Exchange, supra.
[60] See, e. g., United States v. Borden Co., 308 U.S. 188, 200, 60 S.Ct. 182, 84 L.Ed. 181 (1939). Cf. Maryland & Virginia Milk Producers Ass'n Inc. v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960).
[61] Notwithstanding this conclusion, two SEC rulings, cited by plaintiffs in support of their contention that the price maintenance requirements of § 22(d) would not apply if the broker-dealer acted in the capacity of a broker rather than a dealer, deserve mention. One is an Opinion of SEC General Counsel, Investment Company Act Release No. 87 (March 14, 1941). In response to an abstract inquiry, the General Counsel thought that the term "dealer" in § 22(d) "refers to the capacity in which a broker-dealer is acting in a particular transaction." He concluded that when a broker-dealer acts as a broker in a specific transaction, he is not bound to sell at the public offering price. In the Matter of Oxford Co., Inc., 21 SEC 681 (1946), involved a disciplinary proceeding for a broker-dealer alleged to have violated his fiduciary duty to his clients. There the broker-dealer sold mutual fund shares from one of his accounts to another related account, charging the public offering price and retaining the sales load for himself. The SEC, citing the General Counsel's opinion, rejected the technical defense that the subject's actions were mandated by § 22(d).

The Court concludes that reliance on these two decisions is misplaced. They are ad hoc decisions in no way related to the regulated distribution system. Furthermore, they do not address the problem of likely discrimination between similarly situated investors. Such shortcomings preclude a basis for allowing industry-wide cut-price competition in brokerage transactions contrary to the purposes of § 22(d).